82 N.Y.2d 281 (1993)
624 N.E.2d 647
604 N.Y.S.2d 510
North Star Reinsurance Corporation, Respondent-Appellant,
v.
Continental Insurance Company, Respondent, and U.S. Fire Insurance Company, Appellant-Respondent.
Flora Valentin, as Administratrix Ad Prosequendum of The Estate of Julio Feliciano, Deceased, Respondent,
v.
City of New York et al., Appellants and Third-Party Plaintiffs-Appellants. EMD Construction Corp., Third-Party Defendant-Respondent.
Donald M. Prince et al., Plaintiffs,
v.
City of New York, Defendant and Third-Party Plaintiff-Appellant. Slattery-Argrett Joint Venture Co., Third-Party Defendant-Respondent.
Court of Appeals of the State of New York.
Argued September 9, 1993.
Decided November 16, 1993.
Stock, Tinari, Paar, Matthews, O'Connell & Osborn, Mineola (Thomas J. Stock, Thomas A. Osborn and James F. Matthews of counsel), for appellant-respondent in the first above-entitled action.
Quirk and Bakalor, P. C., New York City (Richard Bakalor of counsel), for respondent-appellant in the first above-entitled action.
Alio, Caiati & McDonough, New York City (John J. McDonough and Kevin A. Jones of counsel), for respondent in the first above-entitled action.
Ohrenstein & Brown, New York City (Mark J. Bunim and Jon D. Lichtenstein of counsel), for appellants and third-party plaintiffs-appellants in the second above-entitled action.
Herzfeld & Rubin, P. C., New York City (David B. Hamm, Herbert Rubin and Linda M. Brown of counsel), and Raymond C. Green for third-party defendant-respondent in the second above-entitled action.
Morris, Duffy, Alonso & Marulli, New York City (Irwin H. Haut of counsel), for defendant and third-party plaintiff-appellant in the third above-entitled action.
Ahmuty, Demers and McManus, Albertson (Frederick B. Simpson of counsel), for third-party defendant-respondent in the third above-entitled action.
Judges TITONE, HANCOCK, JR., and LEVINE concur with Chief Judge KAYE; Judge SIMONS dissents in a separate opinion in which Judges BELLACOSA and SMITH concur.
*287 Chief Judge KAYE.
These cases, which originated as damages claims for employees' work site injuries, are today solely contests among insurance carriers over which insurance policy should bear the loss. The novel issue presented is whether this Court will recognize the doctrine of "preindemnification" asserted by insurers for the employer-contractors (the primary wrongdoers) to put the insurance coverage of the construction site owners (who are only vicariously liable) ahead of their own insurance. Having procured the separate insurance for the owners, as required by their agreements, the contractors argue that they have automatically "preindemnified" the owners for losses up to the limits of the owners' policy. We reject that doctrine in favor of common-law indemnification principles, but further conclude that the insurers' claims in Prince and Valentin are precluded by the independent, narrower, antisubrogation rule.

I.
These three appeals present a common fact pattern: in each, the agreement between the contractor and the owner (the City or State) specifies that the contractor will hold the owner harmless against any claims resulting from the contractor's performance, and additionally requires the contractor to procure separate liability insurance for the owner. The contractor now points to the owner's policy as preindemnification (up to the policy limits) for any losses sustained by the owner as a result of the contractor's negligence, and argues that the *288 owner's policy should apply ahead of its own insurance. In all three appeals, more fully described below, common-law  not contractual  indemnification claims are the focus of the parties' arguments.
Valentin v City of New York
In July 1988, EMD Construction Corporation was awarded a contract by the New York City Board of Education for construction and repair work at Louis D. Brandeis High School in Manhattan. The agreement obligated the contractor to maintain owners' contractors' protective (OCP) insurance naming the Board and the City (collectively "the City") as insureds, general contractors' liability (GCL) insurance, insurance against loss or damage to the work site, and workers' compensation insurance. Additionally, the contract provided that the City's right to indemnification would in no way be diminished "by the exercise of any other remedy provided for by contract or by law," and that "[i]f the persons or property of others sustain loss, damage or injury resulting directly or indirectly from the work of [EMD] in their performance of this contract * * * [EMD] shall indemnify and hold THE BOARD and THE CITY harmless for any and all claims and judgments for damages."
As required by contract, EMD purchased an OCP policy from National Union Fire Insurance Company, naming only the City as insured, which afforded the City coverage for bodily injury in the amount of $3 million per occurrence. EMD paid a $3,000 premium for the City's coverage. EMD purchased a separate GCL policy from National Union, which provided coverage for bodily injury of $1 million per occurrence, at a premium of $72,682. EMD also procured a $5 million excess policy from the North River Insurance Company and workers' compensation coverage from the State Insurance Fund.
In November 1988, an EMD employee died of injuries sustained in a fall from the roof of the high school. His administrator brought suit for wrongful death against the City, as the owner of the work site, seeking $12 million in damages, and the City in turn brought a third-party action seeking common-law indemnification on the ground that the contractor's negligence had been the sole cause of the loss.
The trial court granted EMD's motion to dismiss the third-party action on the ground that EMD had preindemnified the City by maintaining the OCP insurance policy, and that the third-party action was, in effect, an improper attempt by an *289 insurer to recover from its own insured. The Appellate Division reinstated the claim to the extent that any judgment exceeded the face amount of the policy, holding that "by requiring the acquisition of insurance on their behalf, third-party plaintiffs have waived any right of common-law indemnity up to the limit of the subject policy" and that the third-party plaintiffs "would be compelling National Union to demand subrogation from its own insured, EMD, for exactly the sort of claim for which EMD purchased the policy in the first place." (187 AD2d 343, 344.) This appeal is before us by the Appellate Division's grant of leave to the City. The Appellate Division certified the following question: "Was the order of this Court, which modified the order of the Supreme Court, properly made?"
Prince v City of New York
In March 1983, the City of New York engaged Slattery-Argrett Joint Venture Company as general contractor on a construction project at the North River Water Pollution Control Project. Pursuant to contract, Slattery purchased an OCP insurance policy from CNA (naming only the City as insured), which afforded coverage for bodily injury and property damage in the amount of $1 million per occurrence, for which it paid a $3,700 premium. For itself, the contractor purchased a separate GCL policy from CNA providing similar coverage for a $74,000 premium, a $1 million excess insurance policy from the Hartford Accident and Indemnity Company, and workers' compensation coverage from Amerisure.
A Slattery employee injured when he fell from a ladder at the work site sued the owner and the contractor. The City cross-claimed against Slattery for indemnification on the ground that the contractor's negligence caused the injuries. The trial court dismissed the employee's direct action against the contractor and deemed the City's cross claim to be a third-party complaint. After denial of the contractor's motion for summary judgment dismissing the third-party action, the jury fixed damages at $335,000, and the trial court directed a verdict in favor of the City on its indemnification claim.
The Appellate Division reversed and dismissed the third-party action, holding that "[p]ermitting the indemnification claim to go forward would involve CNA in an obvious conflict of interest given its obligation to defend Slattery on the same claim that it asserts on behalf of the City." (189 AD2d 33, 37.) The Appellate Division granted leave to appeal to this Court *290 on the following certified question: "Was the order of this Court, which reversed the order of the Supreme Court, properly made?"
North Star Reins. Corp. v Continental Ins. Co.
In July 1984, the State of New York contracted with Fresh Meadows Painting Corporation to clean and paint 20 Suffolk County bridges. As required by contract, Fresh Meadows purchased an OCP insurance policy, naming the State as the only insured, which afforded coverage for bodily injury in the amount of $1 million per occurrence and other coverage, for which Fresh Meadows paid a $1,772 premium. Fresh Meadows also purchased a separate GCL policy from the same insurer, Continental, for a $1,304 premium, which provided coverage for bodily injury and property damage of $500,000 per occurrence, subject to several exclusions, a $2 million excess insurance policy from North Star Reinsurance Corporation, and workers' compensation coverage from U.S. Fire Insurance Company.
Two Fresh Meadows employees injured while painting a railroad overpass sued the State, as owner of the work site, and the State in turn brought a third-party action for common-law indemnification on the ground that the contractor's negligence caused the injuries. Just prior to trial, the employees settled the action for $3 million, funded $750,000 by Continental, $750,000 by North Star and $1,500,000 by U.S. Fire pursuant to stipulation by which the insurers agreed to have their respective liability determined in a declaratory judgment action.
In that action, the various insurers sought summary judgment against one another, which the trial court denied. The Appellate Division, however, granted Continental's motion, holding that the exclusions in the $500,000 GCL policy rendered it inapplicable to the loss, and that the $1 million OCP policy could not be applied to the settlement "because any payments on behalf of the State for vicarious liability would subrogate Continental to the State's claims against Fresh Meadows, the actual wrongdoer." (185 AD2d 187, 188.) The court also determined that, irrespective of Continental's assertion that the OCP also contained an exclusion barring coverage of the claim, Continental had acknowledged coverage under the OCP policy by the stipulation. We granted leave to appeal to U.S. Fire and North Star.

*291 II.

The Preindemnification Doctrine
As a rule, an insurer that has paid a claim on behalf of an insured who is only vicariously liable for the loss is entitled to recover the amount paid by way of indemnity from the wrongdoer (see, 16 Couch, Insurance 2d § 62:187 [rev ed]). The obligation to indemnify arises from the equitable principle that the wrongdoer ought to bear responsibility for the loss (see, Leflar, Contribution and Indemnity Between Tortfeasors, 81 U Pa L Rev 130, 146-148 [1932]).
"Preindemnification" is a departure from this fundamental principle. As framed by the parties, the doctrine would bar a common-law claim for indemnification by the vicariously liable party (or its insurer) to the extent that the wrongdoer, pursuant to contractual obligation, has insured that party against the loss (see, Rawson v Pyramid Champlain Co., 193 AD2d 1052; Rocovich v Consolidated Edison Co., 167 AD2d 524, 526, affd on other grounds 78 N.Y.2d 509; Michalak v Consolidated Edison Co., 166 AD2d 213, 214, lv dismissed 77 N.Y.2d 989).
Preindemnification apparently first appeared more than a decade ago (see, e.g., Covert v City of Binghamton, 117 Misc 2d 1075) and has recently been recognized by the Appellate Divisions as an application of Pennsylvania Gen. Ins. Co. v Austin Powder Co. (68 N.Y.2d 465). As the Appellate Division explained in Michalak (166 AD2d, at 214), "by requiring the procurement of insurance naming itself as `additional insured', Con Edison has waived any right of common-law indemnity" up to the limit of the policy. Citing Pennsylvania Gen., the court additionally noted that permitting the claim "would allow those carriers a right of subrogation against their own insured for a claim arising from the very risk for which the insured was covered" (166 AD2d, at 214-215).
Since Michalak in 1990, the Appellate Divisions have several times applied the doctrine to preclude indemnification claims by an owner against a contractor on similar facts (see, Glinsman v Long Is. Light. Co., 196 AD2d 571; Rawson, 193 AD2d, at 1052; Mcelroye v City of Rochester, 190 AD2d 1025, 1026; Goffredo v Bay St. Landing Assocs., 179 AD2d 799, 801; Fowler v Stillwater Assocs, 169 AD2d 226, 227-228; Rocovich, 167 AD2d, at 526-527; compare, North Star Reins. Corp. v Continental Ins. Co., 185 AD2d 187, 188 [declining *292 to adopt preindemnification]). These later cases rely on Michalak, Pennsylvania Gen. and each other, and offer little by way of analysis. We conclude that the theories advanced in support of preindemnification do not justify the departure from long-standing principles of indemnification.
Preindemnification rests on the legal conclusion that simply by requiring the contractor to maintain the insurance, the owner has automatically waived its right of common-law indemnification (see, Rawson, 193 AD2d, at 1052; Valentin, 187 AD2d, at 344; Rocovich, 167 AD2d, at 526; Michalak, 166 AD2d, at 214).[1]
However, any notion of waiver is contradicted by the plain language of the contracts before us, which explicitly reserve the owners' right to indemnification from the contractor (see, Hawthorne v South Bronx Community Corp., 78 N.Y.2d 433, 437 [common-law and contractual indemnification give rise to distinct claims that may be asserted simultaneously]).
Moreover, the large disparity in premiums paid for the policies covering the owner and contractor signals that indemnification was contemplated by the parties. In Valentin and Prince, the contractor paid more than $70,000 for coverage under the GCL policy and less than $4,000 to insure the owner under the OCP, even though the policies provided similar coverage against the same risk.[2] The OCP premiums evidence the insurers' expectations that there was a relatively low risk of liability under the OCP policies. Moreover, the parties must have anticipated that the OCP would cover the owner's own negligence because full protection against vicarious liability for the contractor's negligence could have been achieved simply by requiring adequate coverage for the contractor (see, Kinney v Lisk Co., 76 N.Y.2d 215, 218; Roblee v Corning Community Coll., 134 AD2d 803, 805, lv denied 72 N.Y.2d 803). Applying preindemnification results in shifting the *293 loss to the OCP policy despite the parties' evident intention that the GCL policy bear all risks other than that of the owner's own negligence.
Nor is preindemnification supported by the policy arguments underlying Pennsylvania Gen.: that permitting indemnification between the owner and the contractor would involve their mutual insurer in a conflict of interest (see, Mcelroye, 190 AD2d, at 1026; Prince v City of New York, 189 AD2d 33, 37), and that the insurer, and not the insureds, ought to pay the loss on the insured risk (see, Glinsman, 196 AD2d, at 572). Indeed, those same policy arguments would preclude contractual indemnification (see, Pennsylvania Gen., 68 NY2d, at 468).
The preindemnification doctrine, however, is different from and potentially broader than the antisubrogation rule. The concept of preindemnification as advanced by the parties would bar indemnification claims wherever a wrongdoer procured insurance on another's behalf, whether or not the wrongdoer was insured by the same company against the same risk. Thus, neither of the policy grounds underlying Pennsylvania Gen. and the narrower antisubrogation rule supports the policy argument now advanced for preindemnification.
The contractors analogize preindemnification to mitigation of the owners' "damages" herein, barring recovery to the extent the owners' liability is covered by the insurance proceeds (see, e.g., Meadvin v Buckley-Southland Oil Co., 84 AD2d 907, revd on dissent below 59 N.Y.2d 822; Moore v Leggette, 24 AD2d 891, affd 18 N.Y.2d 864). In Meadvin and Moore, the injured plaintiff sought to recover damages directly from the tortfeasor, and we agreed that insurance proceeds provided by the wrongdoer should be deducted from the plaintiff's recovery. By contrast, these cases involve vicarious liability, not damages. An indemnitee is entitled to recover the entire amount paid (see, Leflar, Contribution and Indemnity Between Tortfeasors, 81 U Pa L Rev 130, 131 [1932]); there is no "mitigation" of the right to be indemnified.[3]
The contractors assert that the indemnification claims are barred in any event because the owner, whose insurer covered *294 the loss under the OCP, has suffered no personal outlay of funds (see, Glinsman, 196 AD2d, at 572). While it is true that a common-law indemnification claim arises when the party seeking indemnity  i.e., the owner  has suffered an out-of-pocket loss (see, e.g., Bay Ridge Air Rights v State of New York, 44 N.Y.2d 49, 54), the owner's insurer has paid the claim out of its pocket, and the owner may seek indemnification on behalf of its insurer, who is the real party in interest (Pennsylvania Gen., 68 NY2d, at 470). Thus, the fact that the owner did not personally pay the contractor's liability does not support the preindemnification doctrine.
Finally, we reject the contractors' suggestion that preindemnification avoids a windfall to the owner, who has received the benefit of the insurance coverage and now seeks indemnification. Neither the vicariously liable owner seeking indemnification in these cases, nor its insurer, receives a double recovery by being permitted to seek reimbursement from the primary wrongdoer. It is not a "windfall" to be relieved of a vicarious liability.
Thus, we decline to adopt the doctrine of preindemnification.

The Separate Antisubrogation Rule
Subrogation, an equitable doctrine, entitles an insurer to "stand in the shoes" of its insured to seek indemnification from third parties whose wrongdoing has caused a loss for which the insurer is bound to reimburse (see, Pennsylvania Gen., 68 NY2d, at 471; 16 Couch, Insurance 2d § 61:37 [rev ed]; Keeton and Widiss, Insurance Law § 3.10 [a] [Practitioner's ed]). Subrogation allocates responsibility for the loss to the person who in equity and good conscience ought to pay it, in the interest of avoiding absolution of a wrongdoer from liability simply because the insured had the foresight to procure insurance coverage (see, 16 Couch, Insurance 2d § 61:18 [rev ed]). The right arises by operation of law when the insurer makes payment to the insured (see, 16 Couch, Insurance 2d § 61:4 [rev ed]).
An insurer, however, has no right of subrogation against its own insured for a claim arising from the very risk for which the insured was covered (Pennsylvania Gen., 68 NY2d, at 468; 16 Couch, Insurance 2d § 61:136 [rev ed]). Public policy requires this exception to the general rule both to prevent the insurer from passing the incidence of loss to its own insured *295 and to guard against the potential for conflict of interest that may affect the insurer's incentive to provide a vigorous defense for its insured (Pennsylvania Gen., 68 NY2d, at 471-472).
Pennsylvania Gen. involved a single insurance policy under which the insurer sought subrogation against an additional insured. These cases require us to consider whether the antisubrogation rule should be applied in a situation where the owner and contractor are insured under two policies covering the same risk, issued simultaneously by the same insurer. We are unpersuaded that the public policy underlying Pennsylvania Gen. should be limited to the facts of that case and therefore conclude that the same rule applies in the immaterially different circumstance now before us.
The policy considerations underlying Pennsylvania Gen., preventing the insurer from recouping the insurance proceeds from its insured, and avoiding the potential for conflict of interest when the parties' insurer is subrogated against an insured, are equally applicable here. The OCP and GCL were purchased together as coverage against the same risk and paid for by the same party (see, Mollica v Metro-N. Commuter R. R., 1989 WL 123084, *5 [US Dist Ct, SD NY, Sweet, J., 87 Civ 7948]; compare, Note, Extension of the No Subrogation Against Insured Rule, 56 Neb L Rev 765, 773-780 [antisubrogation rule should not be extended to distinct and separate policies]), and, as in Pennsylvania Gen., the covered loss occurred. Application of Pennsylvania Gen. is warranted because the two policies are integrally related and indistinguishable from a single policy in any relevant way.[4]
Plainly, a potential conflict of interest arises where the insurer that issued both policies seeks indemnification against *296 the contractor. As is apparent in the present cases, the mutual insurer, as subrogee of the owner, can fashion the litigation so as to minimize its liability under the GCL. By failing to assert a contractual indemnification claim on the owner's behalf, the insurer can trigger coverage under other insurance policies held by the contractor such as a workers' compensation or excess policy (see, National Union, 790 F Supp, at 492; Covert, 117 Misc 2d, at 1080).[5]
Thus, we conclude that the antisubrogation rule applies to bar the insurers' subrogation claims against the contractors in Prince and Valentin. However, we agree with the Appellate Division in North Star that, because exclusions in the GCL rendered that policy inapplicable to the loss, the antisubrogation rule does not apply in that case.
Accordingly, the orders of the Appellate Division in all three cases should be affirmed, with costs, and the certified questions in Prince and Valentin answered in the affirmative.
SIMONS, J. (dissenting).
The majority concludes that "the doctrine of preindemnification" does not apply in these actions. The contracting parties were, however, free to make any bargain they chose unless it was illegal or contrary to public policy. The insurers here claim that the parties agreed the owner's insurance (purchased by the contractor) was to serve as the owner's indemnity if a claim arose in which the owner was vicariously liable for the contractor's fault. The parties were free to make that agreement if they chose to do so and the only question remaining is whether they did. In my view, a question of fact is presented on that issue and the cases *297 should be remanded for a factual determination of whether the owners waived their common-law right to be indemnified.
My primary disagreement, however, is with the majority's conclusion that the antisubrogation rule prohibits subrogation in these cases. Relying on fears of "potential conflicts of interest", the majority prohibits the insurers from spreading the loss among the contractors' various insurers, though all have been paid premiums to cover the losses at issue here.
Nearly 70 years ago, our Court stated: "It is so well settled as not to require discussion that an insurer who pays claims against the insured for damages caused by the default or wrongdoing of a third party is entitled to be subrogated to the rights which the insured would have had against such third party for its default or wrongdoing. This right of subrogation is based upon principles of equity and natural justice" (Ocean Acc. & Guar. Corp. v Hooker Electrochemical Co., 240 N.Y. 37, 47). That right, so firmly embedded in our equitable jurisprudence and case law, should be abrogated only under compelling circumstances. When we have decided to limit it, we have proceeded cautiously, narrowly defining the proper rule. Thus, in Hartford Acc. & Indem. Co. v Michigan Mut. Ins. Co. (61 N.Y.2d 569), we stated that the antisubrogation rule applies only when a single policy covers both insureds. That rendering of the antisubrogation rule is sound. It broadly recognizes the right to subrogation yet limits the right when the insurer's conflict of interest is most apparent and legal action by the insurer against the insured is likely to undermine the coverage purchased by the insured.
In each of the three cases now before us, the common insurer has issued two policies, one covering the owner and one covering the contractor. The premiums for the two policies differed substantially to reflect the actuarial assessment of the potential liability of the insured for the risks covered by each policy. Unless Hartford is no longer good law, it should govern and the antisubrogation rule should not bar the insurers' litigation against the contractors. I find no support for the majority's statement that Hartford merely "alludes to" the antisubrogation rule (majority opn, at 295, n 4). Indeed, the "single policy" limitation of the antisubrogation rule was essential to our decision in Hartford, and if it is no longer good law, the majority should say so and explain why.
I would find that these cases are governed by Hartford and conclude that the antisubrogation rule is not applicable. The *298 circumstances presented by these cases do not provide compelling reasons to cut back further on the equitable right to subrogation and doing so shifts the losses away from the primary tortfeasors.
The majority justifies extending the prohibition to these cases because a "potential conflict of interest" exists (majority opn, at 295 [emphasis added]). That concern is unfounded on the facts presented. While in form the insurers are suing their own insured, and are therefore on both sides of the lawsuits, in reality they are bringing the suit to reach other insurers because in each case the contractor has additional insurance, issued by insurers other than the subrogees, which may cover the loss. Thus, the subrogees are not seeking to merely transfer assets from one of their pockets to another or even to get the contractor to pay for the loss out of its own pocket; they are trying to fully allocate the loss among those insurers who have undertaken to cover the risk of the contractor's primary negligence.
Moreover, the possibility of conflict is more imagined than real, for as a practical matter an insurer has little incentive to seek subrogation against its own insured if it must shoulder the loss regardless of which party prevails. But here the contractor's other insurers are the real parties in interest, and their presence and adverse interests assure that the issues will be fully litigated, making the action an appropriate vehicle for determining how the loss is to be spread among the insurers. The majority's rule forecloses that allocation of loss, however, and assigns the loss solely to one insurer, no matter what the parties and insurers contemplated and no matter what the various insurance contracts dictate.
It is difficult to find any other grounds in these cases to warrant barring subrogation. The fact that both the owners' and the contractors' policies cover the same risk does not justify a departure from Hartford. The courts are regularly confronted with similar cases of "potential conflicts", cases in which the same insurer covers both parties involved in an automobile accident, for example. The insurer has an independently enforceable contractual obligation to defend each party in such cases and the matter is handled simply by requiring that different counsel be appointed for each party, thereby obviating any conflict and assuring vigorous representation for both sides.
Nor is a conflict created because one party paid for both *299 policies. The duty to defend is owed to the insured, not the purchaser. Indeed, the majority's rule, as far as one can tell from the writing, would apparently allow subrogation if the contractor bought policies for the owner and itself from two different carriers.
It may well be that subrogation should be prohibited in some instances not covered by the Hartford rule  for instance, when the contractor is not insured by others. In such cases, a real conflict of interest may exist, the insureds may face out-of-pocket liability for risks they assumed to be covered by their insurance purchases, and a broadening of Hartford's antisubrogation rule may be justified. But that case is not before us today. In each of these cases, there are two separate insurance policies and adverse parties able and willing to litigate fully the issues arising from an action premised on subrogation. The need for subrogation is apparent because the owner's insurer by suing the contractor, which it also insures, is not merely suing itself, it is seeking to allocate the owner's loss among all insurers who have sold policies to the contractor. The subrogee may legitimately ask them as insurers of the party primarily liable to share in the loss.
Accordingly, I dissent and would vote to reverse the orders of the Appellate Division in all three cases.
In North Star Reins. Corp. v Continental Ins. Co.: Order affirmed, with costs.
In Valentin v City of New York and Prince v City of New York: Order affirmed, with costs, and certified question answered in the affirmative.
NOTES
[1] The dissent misconstrues the contractors' argument concerning the doctrine of preindemnification (dissenting opn, at 296-297). What is at issue in the appeals before us is not case-by-case contractual preindemnification at all. What is at issue is the contractors' assertion that, merely by requiring them to purchase and maintain insurance for the owners, the owners have thereby automatically been preindemnified as a matter of law. Presumably the parties could, if they wished, contract for such a result. We consider, and reject, only the conclusion that the owners' right to common-law indemnification is waived by reason of the contractors' obligation to procure insurance.
[2] In North Star, the contractor paid roughly the same amounts for each policy, but the GCL contained numerous exclusions.
[3] Nor does Leaseway of Cent. N. Y. v Climax Mfg. Co. (81 AD2d 1038, affd on mem below 54 N.Y.2d 822) provide support for preindemnification, wherein the insurance coverage was purchased by the party seeking indemnification, not by the wrongdoer, and a double recovery would have resulted had the claim been allowed.
[4] Our holding in Hartford Acc. & Indem. Co. v Michigan Mut. Ins. Co. (61 N.Y.2d 569, 573) that an insurer must demonstrate a good-faith basis for refusing to implead an affiliated company, does not require a different conclusion (see, Pennsylvania Gen., 68 NY2d, at 471 [noting Hartford alludes to but does not formally address antisubrogation rule]; National Union Fire Ins. Co. v Aetna Cas. & Sur. Corp., 790 F Supp 491, 493 [SD NY], affd 983 F.2d 1048 [2d Cir 1992]). We held in Hartford that Michigan Mutual, in defending two insureds under a GCL, could not refuse on antisubrogation grounds to implead an additional insured under that policy where that insured would have been covered only under a separate workers' compensation policy also issued by Michigan Mutual. The GCL and workers' compensation policies obviously did not cover the same risk  an essential element of our holding here  making Hartford more analogous to the situation where one automobile insurer has insured both drivers involved in the same accident and subrogation is available.
[5] Addressing the dissent, the conclusion that the issue is an open one  not precluded by Hartford  was the Court's unanimous view in Pennsylvania Gen. (68 NY2d, at 471). Nor should we allow subrogation in the factual circumstances presented here. Indeed, to do so exalts form over substance, for the very concerns that motivated Pennsylvania Gen. (where there was a single policy) are present here (though there are two policies). The policies, though separate, were purchased together, by the same party, insuring the same risk  not at all the case in the automobile insurance example given by the dissent. The conflict is real, not simply imagined, as evidenced by the fact that only common-law indemnification claims are asserted here, although an unconflicted insurer might have asserted contractual indemnification claims as well. Finally, we are mindful of the dozen or more Appellate Division opinions, trial court decisions and Federal cases concluding over the past several years that public policy is violated by permitting subrogation in these circumstances. While those decisions confuse the issue by reaching this conclusion under the rubric of "preindemnification," and while they are of course not binding on this Court, they offer persuasive authority for the conclusion we now reach.