**ALLIANZ INSURANCE COMPANY, as subrogee of Mercedes Benz Credit Corporation Plaintiff,**

v.

**Bien OTERO and Peter Williamson, Defendants.**

**No. 04 Civ. 647(PKC).**

United States District Court, S.D. New York.

Dec. 28, 2004.

David M. Ginsberg, Ginsberg, Becker & Weaver, L.L.P., New York, NY, for plaintiff.

John J. Bailly, Bailly & McMillian, L.L.P., White Plains, NY, for defendants.

## MEMORANDUM AND ORDER

CASTEL, District Judge.

This is an action, asserting subject matter jurisdiction by reason of diversity of citizenship, in which the insurer of the owner-lessor of a vehicle seeks to recover from the lessee and her husband, the driver of the vehicle, payments the insurer made to a third-party in settlement of a personal injury claim. The lessee and driver have defended on the ground that they are insureds under the owner-lessor's policies and that New York's antisubrogation rule precludes an insurer from asserting a subrogation claim against its own insured. The parties have cross-moved for summary judgment. For reasons explained below, I deny defendants' motion for summary judgment and grant in part and deny in part plaintiff's motion for summary judgment.

### Background

On March 30, 1999, defendant Bien Otero entered into a 38-month lease of a 1999 Mercedes CLK 320, 2-door coupe, from the Mercedes Benz Credit Corporation ("MBCC"). Little more than two weeks later, on April 16, 1999, while her husband, defendant Peter Williamson, was driving the car, it struck a pedestrian, Evelyn McElroy, at the intersection of Broadway and West 80th Street in Manhattan. Ms. McElroy suffered severe injuries requiring surgery. She retained counsel and negotiation ensued between her attorney and the attorney for Ms. Otero's insurer, Great Northern/Chubb Insurance ("Chubb"). Chubb's policy had limits of $300,000 per occurrence, which was the minimum amount of insurance Ms. Otero was required to carry under her agreement with MBCC. As required by the lease, MBCC was a covered person under the Chubb policy.

Independently (and presumably without the foreknowledge of Ms. Otero), MBCC obtained insurance coverage on all of its owned and leased vehicles from plaintiff Allianz Insurance Company ("Allianz"). Under New York Vehicle and Traffic Law § 388, MBCC had liability exposure for accidents caused by vehicles it owned but were leased to third parties.

Ms. McElroy's injuries required surgery and her attorney refused to settle within the Chubb policy amount. Chubb tendered its policy limits of $300,000. MBCC, as owner, remained exposed for amounts above $300,000. Ms. McElroy's attorney wrote to MBCC asserting that Chubb's $300,000 was inadequate to settle the claim. Eventually, Allianz contributed $200,000 towards a total settlement with Ms. McElroy of $500,000. No suit was ever brought by Ms. McElroy. Now, Allianz, as subrogee of MBCC, has sued Ms. Otero and Mr. Williamson for the $200,000 it paid.

Defendants Otero and Williamson assert that they are insureds under MBCC's policy with Allianz and, under New York's antisubrogation rule, Allianz may not sue its own insureds. In response to the antisubrogation argument, Allianz counters that Endorsement 10 at ¶3 of its policy provides that "no insurance is provided by th[e] policy ...." to the lessee or her permissive users and, to the extent that Endorsement 10 is contrary to New York law in excluding any coverage for permissive users, then its legal obligation was only a potential obligation to provide the statutory minimum of $25,000 per occurrence. It argues that defendants never, in fact, became its insureds and hence the antisubrogation rule has no application. Alternatively, Allianz argues that New York's interpretation of its antisubrogation rule would, at most, bar recovery for the amount for which the insurer actually or potentially covers the insured and not for sums above that amount. Both sides also call my attention to Endorsement 12 of the Allianz policy, which expressly excludes the lessee and her permissive users as insureds for claims above the amount of insurance that the lease required the lessee to maintain, i.e., $300,000 per occurrence.

After hearing oral argument on this motion and receiving supplemental submissions from the parties, I now conclude that, if at the time of the occurrence giving rise to the claim, defendants were potentially insureds for that claim, then New York's antisubrogation rule applies. However, I also conclude that New York would interpret its antisubrogation rule only to preclude the lessor's insurer from recovering amounts within the insurer's potential layer of coverage of the lessee-insured. At the time of the occurrence giving rise to the claim, Allianz was potentially defendants' primary insurer either to the extent of the $25,000 bodily injury statutory minimum or the $300,000 per occurrence that a reading of Endorsement 12 in conjunction with the lease would imply. In either case, Allianz's coverage, had it been called upon, would have been primary coverage for the *first* $25,000/$300,000. It is not necessary for me to determine which per occurrence limit applies ($25,000 vs. $300,000) because the sum that Allianz seeks to recover is for the $200,000 over the first $300,000 that was paid for by Chubb, the defendants' primary insurer. Based upon my reading of New York's public policy, a subrogor is not prohibited from enforcing the subrogee's common law and contractual indemnity rights against a third-person for amounts in excess of the potential insurance, even if that third-person is potentially the subrogor's insured for some lesser amount.

Before I travel into what Judges Cardozo and Mulligan have described as the Serbonian Bog of New York insurance law,[1] I will address an issue of personal jurisdiction.

1. J.M. McLaughlin, *In Memoriam: William Hughes Mulligan,* 65 Fordham L.Rev. 15, 17 (1996).

*Personal Jurisdiction*

Defendants assert a lack of personal jurisdiction by reason of improper service of process, and cross-move to dismiss on this ground. In prior litigation in this Court between the same parties, defendants successfully moved to dismiss the action on the grounds of improper service. *Allianz Ins. Co. v. Otero*, 2003 WL 262335 (S.D.N.Y. Jan.30, 2003). The plaintiff, unable to personally serve defendants, relied upon the "nail and mail" provision of CPLR 308(4) and attempted service at 11 Pearlbush Lane, Poughkeepsie, New York. In an affidavit submitted to Judge McKenna, defendant Williamson swore that, as of late 1999, he no longer lived at 11 Pearlbush Lane and that his "present address ... [is] 87 Mill Street, Putnam Valley, New York 10579, *which is my primary residence.*" *Allianz Ins. Co. v. Otero*, 01 Civ. 2598 (Affidavit sworn to on August 14, 2002) (emphasis added). Ms. Otero swore to an affidavit that was identical in this respect and also gave 87 Mill Road as her address at her September 9, 2002 deposition.

Plaintiff's process server attempted to serve defendants at 87 Mill Street, Putnam Valley, New York, On Tuesday, February 3, 2004 at 6:50 p.m.—the early evening. Unsuccessful, he returned again on the morning of February 4 at 7:55 a.m. Again, he did not find either defendant. On February 5, he returned and attempted to personally serve defendants at 2:45 p.m. but was unsuccessful. Ms. Kiessling, a neighbor, confirmed that defendants lived at the foregoing address "but was unable to divulge" their place of employment.

Concluding that the due diligence requirement of CPLR 308(4) had been satisfied, the process server affixed a copy of the Summons and Complaint on the door of 87 Mill Street on February 5 at 2:45 p.m. and mailed a copy to the same address on February 6.

■ On February 19, defendants, by counsel, appeared in this action by filing an answer and asserting eleven affirmative defenses, including improper service of process. In their answer to the complaint, Otero and Williamson denied "knowledge or information sufficient to form a belief" as to the allegations of their residences.[2] As was the case with the action filed before Judge McKenna, Otero and Williamson declined in this action to avail themselves of a pre-answer motion to dismiss, as was their right. By timely raising the defense in their answer, defendants have preserved the issue. Rule 12(h), Fed. R.Civ.P.

At an on-the-record telephone conference held on December 9, 2004, I inquired of the parties whether either side was seeking an evidentiary hearing on issues relating to the defense of lack of personal jurisdiction; each side confirmed that they

---

**2.** The Complaint had alleged the old Poughkeepsie address, 11 Pearlbush Lane, for Ms. Otero and for Mr. Williamson, a Manhattan address, 189 West 89th Street, that appears in the police report; hence, each could truthfully deny the allegations. However, the purported basis for a denial of sufficient information to form a belief as to their own residences is not readily apparent. If the basis was the temporal qualifier "[a]t all times relevant", that does not take defendants very far given the fact that the date of the lease and the date of the accident were alleged in the pleading and were a little over two weeks apart. True, "all times relevant" could also extend to the unpled date of payment by Allianz to McElroy, but they should have been able to admit or deny whether the addresses alleged were their residences at any of the times expressly alleged to be relevant in the Complaint. *See* Rule 8, Fed. R.Civ.P. ("When a pleader intends in good faith to deny only part or a qualification of an averment, the pleader shall specify so much of it as is true and material and shall deny only the reminder.")

were not. Defendants, accepting the facts in the affidavit of service, contend that they are insufficient to establish proper service. Conversely, plaintiff accepts the facts set forth in the Williamson and Otero affidavits but argues that service was proper nonetheless.

Williamson's affidavit asserts that "[i]n February of 2004 I spent weekends at 87 Mill Street" and that his "weekday residence was 490 West End Avenue." (Affidavit sworn to on October 7, 2004) Pointedly, he does not claim that in February 2004, 87 Mill Street was not his "actual ... dwelling or usual place of abode" or that it ceased to be his primary residence, as he swore it was in his affidavit of August 2002. To repeat, he merely states that "[i]n February of 2004" he "spent weekends" and not weekdays at 87 Mill Street. Otero's affidavit is the same. In the face of the August 2002 affidavit and the Kiessling confirmation, Williamson and Otero's claim covering no more than a 30–day period is insufficient to establish the defense.

CPLR 308(4) permits service by affixation on the door of the "actual place of business, dwelling place or usual place of abode" followed by mailing to the last known address, if, but only if, due diligence has been exercised:

> where service under paragraphs one [delivery to the person] and two [delivery to person of suitable age and discretion and mail] cannot be made with due diligence, by affixing the summons to the door of either the actual place of business, dwelling place or usual place of abode within the state of the person to be served and by either mailing the summons to such person at his or her last known residence or by mailing the summons by first class mail to the person to be served at his or her actual place of business ... such affixing and

mailing to be effected within twenty days of each other....

 "The due diligence requirement of CPLR 308(4) should be strictly observed, given the reduced likelihood that a summons served pursuant to that section will be received." *Moran v. Harting,* 212 A.D.2d 517, 518, 622 N.Y.S.2d 121 (2d Dep't 1995). I conclude that the process server was duly diligent in his pre-affixation attempts to personally serve defendants. Though perhaps besides the point in terms of the propriety of service, plaintiff's efforts resulted in actual and timely notice to Williamson and Otero.

The very premise of all efforts to serve under CPLR 308(4) is that the person to be served cannot be found at the location. True, the concept of "actual dwelling or usual place of abode" means more than last known address. *See Feinstein v. Bergner,* 48 N.Y.2d 234, 239, 422 N.Y.S.2d 356, 397 N.E.2d 1161 (1979). But Williamson and Otero do not contend that they stopped living at 87 Mill Street on a regular or "usual" basis. They just stopped living there on weekdays in February 2004. Had Williamson and Otero taken a month long cruise, 87 Mill Road would not cease to be their "actual ... dwelling place or usual place of abode...." Vacating 87 Mill Road on weekdays in February 2004 did not take the premises outside the scope of CPLR 308(4).

 Williamson also states that in February 2004 he worked for "Krow Design" in Manhattan and argues that the process server was not duly diligent because he made no effort to serve him there. Williamson has made no showing of how a duly diligent person could have come to acquire this information. While plaintiff might have pursued other avenues to learn Mr. Williamson's place of employment, he was not required to exercise the utmost diligence. The plaintiff's process server's

inquiry of Ms. Kiessling as to defendants' place of employment on these facts satisfied the due diligence requirement.[3]

Service of process was proper and personal jurisdiction was acquired over both defendants.

*Summary Judgment*

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. Thus, it is the initial burden of a movant on a summary judgment motion to come-forward with evidence on each material element of his claim or defense, demonstrating that he is entitled to relief. The evidence on each material element, if unrebutted, must be sufficient to entitle the movant to relief in his favor, as a matter of law. *Vermont Teddy Bear Co., Inc. v. 1–800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004). A fact is material if it "might affect the outcome of the suit under the governing law...." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

When the moving party has met this initial burden and has asserted facts to demonstrate that the non-moving party's claim cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts asserted by the mov-

ant. Rule 56(e), Fed.R.Civ.P. An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. The Court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party." *Allen v. Coughlin,* 64 F.3d 77, 79 (2d Cir.1995) (quotations and citations omitted); *accord Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In the absence of any disputed material fact, summary judgment is appropriate.

In this case both sides have moved for summary judgment and have submitted statements pursuant to Local Rule 56.1.

*Choice of Law*

 The choice of law rules of the forum state, New York, govern in this diversity action. *Klaxon Co. v. Stentor Electric Manufacturing Co.,* 313 U.S. 487, 496–97, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). To determine which jurisdiction's law New York would apply to the common law (or implied) indemnity claim against both Ms. Otero and Mr. Williamson, I look to *Restatement (Second), Conflict of Laws* § 173, which specifically addresses indemnity claims.[4] It sensibly asserts that the choice of law principles generally applicable to the underlying tort determine whether one tortfeasor has a right of indemnity against another tortfeasor. *Id.* In tort cases, New York applies the law of the

---

**3.** Pointedly, the August 2002 affidavit informed the reader of where Williamson did not work but did not purport to speak to where he did work. As a source of information on Williamson's place employment that a diligent party might have consulted, the affidavit was useless.

**4.** From time to time, New York courts will look to the Restatement (Second), Conflict of Laws as a source of guidance. *See, e.g., Tanges v. Heidelberg North America, Inc.,* 93 N.Y.2d 48, 687 N.Y.S.2d 604, 710 N.E.2d 250, (1999); *Nuernberger v. State,* 41 N.Y.2d 111, 390 N.Y.S.2d 904, 359 N.E.2d 412 (1976).

state with the most significant interest in the litigation. *See Padula v. Lilarn Properties Corp.*, 84 N.Y.2d 519, 521, 620 N.Y.S.2d 310, 644 N.E.2d 1001 (1994). As the Second Circuit pointed out in *Lee v. Bankers Trust Co.*, "[i]n weighing interests, New York distinguishes between 'conduct regulating' and 'loss allocating' rules. If conduct regulating rules are in conflict, New York law usually applies the law of the place of the tort (*'lex loci delicti'*). However, if loss allocating rules conflict, the choice of law analysis is governed by the so-called *Neumeier* rules." 166 F.3d 540, 545 (2d Cir.1999) (citations omitted); *see also Neumeier v. Kuehner*, 31 N.Y.2d 121, 128, 335 N.Y.S.2d 64, 286 N.E.2d 454 (1972) (applying the Ontario guest statute to the relationship between driver and passenger in accident occurring in Ontario). Here, while MBCC is situated in Connecticut and its insurer, Allianz, is situated in California, the vehicle was registered in New York and, hence, statutorily subject to New York's Motor Vehicle Financial Security Act, Vehicle & Traffic Law § 310 *et seq.*, and the statutory liability of the owner for damages caused by a driver operating with permission, Vehicle & Traffic Law § 388. The defendants are located in New York, a fact known to the Mercedes Benz dealer who acted as MBCC's agent. The underlying accident occurred in New York. The victim was a New York resident. New York has a strong interest in the relationship between the owner, lessee and insurers of a New York registered vehicle operated in New York by a New York resident that injured a New York resident.

 The contractual indemnity provision in the agreement between MBCC and Ms. Otero rests on a different footing. The lease between MBCC and Ms. Otero contains a choice of law provision that "[t]he laws of the state where the Lessor (Dealor) has its principal place of business will govern this Lease and any disputes that may arise between us." ¶ 25 Here, the automobile dealership that acted as attorney-in-fact for MBCC is located in New Jersey. "New York law is clear in cases involving a contract with an express choice-of-law provision: Absent fraud or violation of public policy, a court is to apply the law selected in the contract as long as the state selected has sufficient contacts with the transaction." *Hartford Fire Insurance Co. v. Orient Overseas Containers Lines (UK) Ltd.*, 230 F.3d 549, 556 (2d Cir.2000). *Cf.* N.Y. G.O.L. § 5–1401 (contracts in excess of $250,000 need not bear a reasonable relationship to the selected jurisdiction). The presence of the automobile dealership in New Jersey gives it a sufficient nexus to the lease agreement. Thus, the contractual indemnity claim is governed by New Jersey law, although no disputed contract construction issues arise under the lease agreement, itself. All other issues are governed by New York law.

*The Contractual and Common Law Indemnity Claims*

As noted, the leasing agreement between MBCC and Ms. Otero required her to obtain a policy of insurance with limits of $300,000 per occurrence for bodily injury or death and listing MBCC as an additional insured. MBCC verified the existence of Ms. Otero's insurance and identified her carrier in the lease agreement.

The lease contained a broad indemnification of the lessor-owner by the lessee. It provided that "[i]f you are subjected to any claims, losses, injuries, expenses, or costs related to the use, maintenance, or condition of the vehicle, I will pay all of your resulting costs and expenses, including attorneys' fees." ¶ 23 It is this contractual

indemnity provision that forms the basis for the first claim in the complaint against. Ms. Otero.

■ The second claim is for common law or implied indemnity against both Ms. Otero and Mr. Williamson. It is well-settled in New York that a passive tortfeasor whose liability is premised entirely upon the active wrongdoing of another may recover against the active tortfeasor on a claim of implied indemnity. In *McDermott v. City of New York*, 50 N.Y.2d 211, 216–17, 428 N.Y.S.2d 643, 406 N.E.2d 460 (1980), Judge Cooke set forth the principles that underlie the rule:

Conceptually, implied indemnification finds its roots in the principles of equity. It is nothing short of simple fairness to recognize that '[a] person who, in whole or in part, has discharged a duty which is owed by him but which as between himself and another should have been discharged by the other, is entitled to indemnity'. To prevent unjust enrichment, courts have assumed the duty of placing the obligation where in equity it belongs. As was true with many unjust enrichment cases, the vehicle through which the law operated was the quasi contract. Thus, the rule developed that '[w]here payment by one person is compelled, which another should have made * * * a contract to reimburse or indemnify is implied by law'. (alterations in original; citations and footnote omitted)

■ Though the right to indemnity, whether contractual or implied, belongs to MBCC, its policy of insurance with Allianz transfers MBCC rights against third-persons to Allianz. (IV.A.5) This contractual assignment is consistent with New York's recognition of principles of equitable assignment embodied in the common law doctrine of subrogation. In *Pittsburgh–Westmoreland Coal Co. v. Kerr*, 220 N.Y. 137, 143, 115 N.E. 465 (1917), the Court traced the American roots of the doctrine and described its legal underpinnings:

The right of subrogation or of equitable assignment is not founded upon contract nor upon the absence of contract, but is founded upon the facts and circumstances of a particular case and upon principles of natural justice, and generally where it is equitable that a person furnishing money to pay a debt should be substituted for the creditor or in place of a creditor such person will be so substituted.

Allianz, as subrogee, has MBCC's right to pursue claims for contractual and common law indemnity against Ms. Otero and Mr. Williamson, unless barred by the anti-subrogation doctrine prohibiting claims against one's own insured. To analyze this defense, it is useful to begin with the terms of the policy between MBCC and Allianz.

## The Policy Issued by Allianz to MBCC

Mindful of its exposure as the titleholder of the automobiles that it leases to the public, MBCC obtained substantial insurance coverage from plaintiff Allianz. The policy is intended for the protection of MBCC, though it affords certain protections to the lessees who, presumably, are not aware and do not rely on the existence of the policy at the time of entering into the lease. The Allianz–MBCC policy named as insureds "[a]nyone else while using with your permission a covered auto you own. . . ." (II A., 1(b) at p. 2) "[U]sing" in this context is a broad enough to encompass both the lessee who enjoys the right of possession of the car and the operator, in this case her husband, who operates the car with the lessee's permission.

The above-quoted language is modified by an endorsement to the policy that, generally speaking, takes precedence over the

form policy language. *See Rhinebeck Bicycle Shop, Inc. v. Sterling Insurance Co.,* 151 A.D.2d 122, 126, 546 N.Y.S.2d 499 (3d Dep't 1989). Endorsement 12 to the Allianz–MBCC policy excludes as an insured the lessee or any person operating the vehicle with the permission of the lessee to the extent of the difference of the amount of the insurance the lessee was required under the lease agreement, in this case $300,000 per occurrence, and the higher policy limits (which appear to be $2 million per "accident" bodily injury and property damage combined). The language of the exclusion is as follows:

> THE LIMIT OF INSURANCE SHOWN IN THE SCHEDULE REPLACES THE LIMIT OF ANY LEASING AGREEMENT, SUBJECT TO THE FOLLOWING PROVISIONS:
>
> FOR THE DIFFERENCE BETWEEN THE LIMIT OF INSURANCE SHOWN IN THE SCHEDULE AND THE LIMIT OF INSURANCE SHOWN IN ANY LEASING AGREEMENT THAT REQUIRES A LESSEE TO PROVIDE PRIMARY INSURANCE FOR YOU, WHO IS AN INSURED APPLIES EXCEPT THAT NONE OF THE FOLLOWING IS AN "INSURED":
>
> a. THE LESSEE;
>
> b. ANY EMPLOYEE OR AGENT OF THE LESSEE;
>
> c. ANY PERSON OPERATING AN "AUTO" WITH THE PERMISSION OF ANY OF THE ABOVE.

Even under the exclusion, the lessee and the lessee's permissive users remain insureds up to the amount of the $300,000 per occurrence that the lessee was required to maintain as insurance under the lease agreement. Taking the language at face value, those "using" the vehicle cease to be "insureds" for the amount above the $300,000.[5]

There is a more general endorsement which also has bearing on the lessee's status as an insured. On its face, Endorsement 10 at ¶ 3 purports to exclude the lessee and her permissive users as insureds for any purpose: "FOR THE LESSEE ... OR ANYONE OPERATING AN 'AUTO' WITH THE PERMISSION OF [THE LESSEE], NO INSURANCE IS PROVIDED BY THIS POLICY."

 Allianz concedes that it may not lawfully exclude a permissive user of a vehicle from coverage, which the owner by law is required to maintain. It does not seriously dispute that an owner-lessor, such as MBCC, is required to maintain insurance for its owned vehicles that meets the statutory minimum coverage of at least $25,000 per occurrence for bodily injury and this insurance must cover any persons "using or operating ... [the vehicle] with the permission, express or implied, of such owner." Vehicle & Traffic Law § 388(1) & (4); *see id.* at § 311(4) (owner's policy of insurance must cover "use" and "operation" of the vehicle). True, the definition of an owner also "includes" a long-term lessee but that does not exclude the titleholder-lessor as an owner or co-owner. *See* Vehicle and Traffic Law § 128 and § 388(3); *GE Capital Auto Lease, Inc. v. Allstate Insurance Co.,* 281 A.D.2d 456, 722 N.Y.S.2d 549 (2d Dep't 2001); *but see Travelers Property & Casualty Co. v. GE Capital Auto Lease, Inc.,* 2001 WL 1673432 (N.Y. Sup.Ct., Suffolk Co., Sept. 28, 2001) (titleholder-lessor not an owner

---

5. The language of Endorsement 12 at paragraphs 1 and 3 support the conclusion that that the form policy's term "using" was intended to include both the lessee and a motorist operating the vehicle with the lessee's permission. If they were not intended to be included, then logically they would not be referred to in the exclusion.

within the meaning of the statute).[6] Defendants argue that both Endorsement 12 and paragraph 3 of Endorsement 10 are nullities because they conflict with New York law, which, in defendants' view, would not permit an owner of a vehicle to stepdown the limits of coverage for a category of permissive users of the vehicle. In support, they cite Vehicle & Traffic Law § 345 and 11 N.Y.C.R.R. § 60–1.1(c).

■■■■ Defendants' argument that the owner-lessor's policy with Allianz cannot law-fully have lower limits for the lessee and her users does not reflect New York law. In *Liberty Mutual Insurance Co. v. Aetna Casualty & Surety Co.*, 168 A.D.2d 121, 571 N.Y.S.2d 735 (2d Dep't 1991) ("*Liberty I*"), the Court upheld the lawfulness of a provision in an owner-lessor's policy that afforded the owner-lessor $1 million in coverage but had a "stepdown" provision that provided only $100,000 in coverage for the lessee and the lessee's driver. The lessee who was, in effect, the unknowing insured under the owner-lessor's policy argued, as does defendant in this case, that New York prohibited the insurer from providing different levels of coverage to the owner-lessor, on the one hand, and a permissive user such as the lessee or the lessee's driver, on the other.[7] It reasoned that "insurance policies, like all contracts, should be enforced according to their terms unless they are prohibited by public policy, statute or rule." *Id.* at 131, 571 N.Y.S.2d 735. *See also Alinkofsky v. Countrywide Insurance Co.*, 257 A.D.2d 70, 691 N.Y.S.2d 479 (1st Dep't 1999) (stepdown coverage in a rental car company's policy tacitly approved); *GEICO v. Chrysler Insurance Co.*, 256 A.D.2d 1212, 1213, 682 N.Y.S.2d 508 (4th Dep't 1998) ("Neither public policy nor any language in Vehicle & Traffic Law § 388, however, prohibited the parties' insureds from privately contracting to permit defendant's insured from disclaiming that portion of its liability that exceeds the amount for which vehicle owners are required to be insured.").[8]

### New York's AntiSubrogation Rule

■■■■ As discussed, an insurer who has paid on its insured's claim has the common law right to subrogation against the person who is responsible for the wrong. The right is not dependent upon any contractual relationship between the insured and the third person but rather arises as a matter of equity. But New

---

6. At oral argument, counsel for Allianz conceded that there could be circumstances under which the policy it issued to MBCC would afford coverage to the lessee, *e.g.*, if the lessee did not maintain a policy affording coverage. (Transcript of November 19, 2004 at 3–6, 12–14)

7. In *Liberty I*, the argument was advanced that the step down provision violated section 311(4) of the Vehicle & Traffic Law and 11 NYCRR 60.1(c)(2). The Court also considered and rejected the proposition that the provision violated section 388(4) of the Vehicle & Traffic Law and Insurance Law 3420(e) of the Insurance Law.

8. *GEICO v. Chrysler* arose in the context of a rental agreement that stated that the owner was providing no insurance coverage for the renter; thus a contractual disclaimer was also at issue. I do not read *Jefferson Insurance Co. of New York v. Travelers Indemnity Co.*, 92 N.Y.2d 363, 681 N.Y.S.2d 208, 703 N.E.2d 1221 (1998), to condemn stepdown policies in a leasing context. There, a stepdown provision in an owner-lessor's policy was found not to apply to the lessee of the vehicle. *Id.* at 373, 681 N.Y.S.2d 208, 703 N.E.2d 1221. The Court's reasoning was not that a stepdown provision with lower coverage for the vehicle's lessee was in conflict with any statute, regulation or statement of public policy but rather that the policy at issue had to be read in the context of the leasing agreement through which the owner-lessor had expressly promised to secure coverage at the higher level. *Id.*

York circumscribes this broad equitable principle by restricting the ability of the insurer to bring a claim against one whom it has insured. *Pennsylvania General Insurance Co. v. Austin Powder Co.*, 68 N.Y.2d 465, 510 N.Y.S.2d 67, 502 N.E.2d 982 (1986). This antisubrogation rule extends to circumstances where the insured is not the customer of the insurer but, in effect, free-rides on the insurance coverage of another who pays a premium for the coverage. *Id.* It also bars a claim where there is an express indemnity agreement by the free-riding insured indemnifying the premium-paying insured. *Id.*

In *Pennsylvania General*, Austin Powder rented a truck from Bison Ford. In the rental contract, Austin Powder agreed to indemnify Bison Ford for claims arising out of the use of the truck. Bison Ford obtained a primary and excess insurance policy with Liberty Mutual. Austin Powder had certain excess coverage of its own, as well as a policy covering contractual liability. *Id.* at 468, 510 N.Y.S.2d 67, 502 N.E.2d 982. The truck, used by Austin Powder to transport explosives, accidentally detonated causing extensive damage to property of others.

The insurer of one of the injured property owners, Pennsylvania General, brought an action against Bison Ford whose insurer, Liberty Mutual, had settled with the property owner. A claim for indemnification was then asserted by Bison Ford against Austin Powder. Since Bison Ford, itself, suffered no loss (the loss was borne by its insurer), the Court construed the claim as having been asserted by Liberty Mutual against Austin Powder.

The Court of Appeals proceeded from the premise that Austin Powder was an "additional insured" on Bison Ford's Liberty Mutual Policy (whether it knew it at the time or not). It concluded that the insurer's right of subrogation ought not extend to one who was the insurer's insured: "To allow the insurer's subrogation right to extend beyond third parties and to reach its own insured would permit an insurer, in effect, 'to pass the incidence of the loss * * * from itself to its own insured and thus avoid the coverage which its insured purchased.'" 68 N.Y.2d at 471, 510 N.Y.S.2d 67, 502 N.E.2d 982 (citation omitted). The Court reasoned that the vigor of the insurer in defending Bison Ford would be diminished if it knew it could pass the loss on to its other insured, Austin Powder:

Here, for example, the interests of the insured indemnitor, Austin Powder, can only be fully protected through the vigorous defense of the indemnitee, Bison Ford. Yet, if indemnification from Austin Powder could be had for losses sustained on Bison Ford's behalf, Liberty Mutual would have less incentive to defend Bison Ford from claims made against it. As a consequence, allowing indemnification might sanction an indirect breach of the insurer's obligation to defend its insured Austin Powder. Furthermore, it would sanction a direct breach of the primary obligation the insurer undertook—the obligation to indemnify Austin Powder from loss. *Id.* at 472, 510 N.Y.S.2d 67, 502 N.E.2d 982.

The Court further concluded that there should be no exception from this rule because of the "mere fortuity that Austin Powder had separate insurance covering the same loss and had expressly agreed to indemnify." *Id.* That the New York rule addresses potential conflicts arising from potential coverage is illustrated by *Pennsylvania General*. The owner-lessor's insurer was never called upon to provide actual insurance coverage to the lessee. But the fact of potential coverage and potential conflicts arising therefrom was sufficient to invoke the antisubrogation rule.

Subsequent cases have noted the antisubrogation rule's public policy concern to "guard against the *potential* for conflict of interest that may affect the insurer's incentive to provide a vigorous defense for its insured...." *North Star Reinsurance Corp. v. Continental Insurance Co.*, 82 N.Y.2d 281, 294, 604 N.Y.S.2d 510, 624 N.E.2d 647 (1993) (citation omitted) (emphasis added).[9]

In *Jefferson*, the Court had occasion to expressly reject an argument that the antisubrogation rule ought not protect an automobile lessee because the lessee is not a named insured but an incidentally covered person:

> For the purposes of the antisubrogation rule, there is simply no reason for treating a "permissive user" insured differently than a named insured. An insurer covering a permissive user under its policy would still be subject to the same potential conflict of interest, and an insurer in explicitly providing for such coverage should not be surprised to pay claims that it covered. 92 N.Y.2d at 374–75, 681 N.Y.S.2d 208, 703 N.E.2d 1221.

The issue of whether the antisubrogation rule is a complete bar or only a *pro tanto* bar to the extent of the amount of the coverage arose in a pair of cases decided by the Second Department. As noted previously, in *Liberty I*, the owner-lessor's policy afforded the owner-lessor $1 million in coverage but had a stepdown provision that provided only $100,000 in coverage for the lessee and the lessee's driver. Several years later (and after the decision in *North Star*), the Second Department had occasion to address the question of whether the fact that the lessee was an insured under the owner-lessor's policy precluded the owner-lessor's insurer from bringing any subrogation action against the lessee or merely precluded the owner-lessor's insurer for suing for amounts within the $100,000 stepdown coverage. *Liberty Mutual Insurance Co. v. Aetna Casualty & Surety Co.*, 235 A.D.2d 523, 652 N.Y.S.2d 764 (2d Dep't 1997) (*Liberty II*). The victim of the auto accident had recovered a verdict in excess of $1.5 million. The owner-lessor's insurer paid $100,000 on behalf of the lessee's driver but sought to recover amounts over and above the $100,000 from the lessee's driver who was undeniably its insured for the first $100,000. Based upon its reading of *Pennsylvania General* and *North Star*, the *Liberty II* Court held that recovery was entirely precluded under the antisubrogation rule: "since Liberty [the owner-lessor's insurer] simultaneously insured both Oxford [the owner-lessor] and Manny's [the lessee], Esther Dancour's [the driver's] employer, for the same risk, the antisubrogation rule is applicable and precludes Liberty from seeking, through subrogation of Oxford's rights, indemnification from Esther Dancour for payments over $100,000." *Id.* at 526, 652 N.Y.S.2d 764. If the memorandum opinion of the Second Department in *Liberty II* were the last word on the subject, Allianz's claim against Otero and Williamson would be barred in its entirety.

A subsequent decision of the Court of Appeals leads me to the conclusion that *Liberty II* is not reflective of the present state of New York law on the subject and that New York's highest court would hold that the insurer-subrogor is only precluded from seeking recovery for that portion of the risk for which there potentially is coverage and is not precluded from seeking recovery of sums above

---

9. In *North Star*, the Court clarified the scope of antisubrogation rule and held it inapplicable in a situation where the seemingly insured party was not, in fact, an insured party by reason of an applicable policy exclusion. *Id.* at 296, 604 N.Y.S.2d 510, 624 N.E.2d 647.

the potential coverage level. In *ELRAC, Inc. v. Ward,* 96 N.Y.2d 58, 724 N.Y.S.2d 692, 748 N.E.2d 1 (2001), the Court of Appeals was faced with four cases in which an automobile rental company, ELRAC, sought contractual indemnification from the party renting the vehicle for injuries to third persons. ELRAC elected to self-insure the vehicles but was subject to the same minimum liability insurance requirements. *Id.* at 74, 724 N.Y.S.2d 692, 748 N.E.2d 1. The Court concluded that, for the amounts above the statutory minimum insurance, ELRAC could enforce the indemnification clause:

> For amounts above the statutory minimums, however, ELRAC may enforce the indemnification clause in its rental agreements. ELRAC is not statutorily bound to provide additional coverage, nor did it voluntarily undertake any obligation to do so. Thus, there is no legal basis to void the indemnification agreement for amounts exceeding the mandatory minimums. Indeed, to further 'abrogate the right of indemnification' would disparage 'the important countervailing right of freedom of contract'.... Further, antisubrogation principles do not bar ELRAC from seeking indemnification for amounts exceeding the statutory limits.

> \*　　\*　　\*　　\*　　\*　　\*

In sum, Vehicle and Traffic Law § 370 requires rental car companies to provide primary insurance to their renters up to the minimum liability limits provided by the statute. Thus, the indemnification clause in ELRAC's rental agreements, which seeks to disclaim that duty and assign the risk to the renters themselves, is unenforceable to that extent. The indemnification clause, however, if otherwise valid, is unenforceable for amounts exceeding the statutory minimum liability requirements. *Id.* at 77–

78, 724 N.Y.S.2d 692, 748 N.E.2d 1 (citation omitted).

True, *ELRAC* arose in the context of a rental car agreement rather than a long-term auto lease. There are distinctions in terms of the statutory basis for required insurance coverage between a short-term rental and a long-term lease. *Compare* Vehicle and Traffic Law § 128 (owner "includes any lessee") *with* Vehicle & Traffic Law § 370(3) ("renting or leasing rental vehicles"). But the distinction extends to whether the party was, indeed, a potential insured at the time of the occurrence. Here, I have determined that the defendants were, at the time of the occurrence, potential insureds of Allianz. Thus, the fact that it was a long-term lease offers no basis for distinguishing *ELRAC.*

It is also true that *ELRAC* arose in the context of self-insurance and, thus, subrogation and antisubrogation did not, strictly speaking, apply but the *ELRAC* Court noted that the "policy behind the antisubrogation rule" supported its conclusion. *Id.* at 77, 724 N.Y.S.2d 692, 748 N.E.2d 1. This conclusion is further buttressed by the holding in *Curran v. City of New York,* 234 A.D.2d 254, 651 N.Y.S.2d 54 (2d Dep't 1996), cited with approval in *ELRAC,* concluding that an antisubrogation argument by a lessee did not preclude a claim brought by the owner-lessor's insurer for the amount above the limits for which it had potentially insured the lessee.

I do not read the Court of Appeals decision in *Jefferson Insurance Co.* (decided before *ELRAC* and after *Liberty II*) to undercut my reading of *ELRAC.* There, the owner-lessor, A–Drive, contractually promised its lessee, Continental Copy, that it would obtain $500,000 in coverage on Continental Copy's behalf. In turn, Continental Copy agreed to indemnify A–Drive. While the vehicle was in use by Continental Copy, it struck a pedestrian who, in

turn, sued A–Drive and the driver, but not Continental Copy. A–Drive's primary carrier, Reliance, and its excess carrier, Jefferson, paid $900,000 to settle the pedestrian's claim. The Court, based upon its reading of the contractual provisions, concluded that Reliance had insured the lessee for the full amount of its policy.[10] Applying the antisubrogation rule, the Court held that Reliance could not sue the lessee's insurer on a subrogated claim under the leasing agreement's indemnity provision:

> [T]he fact that Reliance insured Continental Copy because it was a permissive user of the van instead of a named insured is immaterial for purposes of application of the antisubrogation rule, and a claim against Travelers grounded on an indemnity theory of recovery must fail. 92 N.Y.2d at 215, 677 N.Y.S.2d 280, 699 N.E.2d 904

Because on the facts of *Jefferson Insurance Co.*, the stepdown provision did not apply and all of Reliance's coverage of A–Drive was available to cover Continental Copy, the Court did not have occasion to pass upon the question of whether Reliance could have recovered a portion if its policy had afforded Continental less coverage than A–Drive.

New York could have reasonably concluded that it would not permit an owner-lessor's insurer to recover any sums from a lessee because facts could exist under which the lessee could become an insured and the insurer would then owe both the lessor and the lessee separate duties to defend; in such an instance, the insurer would have the arguable incentive to quickly settle the claim within the higher limits of the premium-paying lessor (and thereby cut-off defense costs) and later seek to recover from the lessee the difference between the stepdown coverage of the lessee and the higher amount paid on the claim. But, New York also could reasonably conclude that it would not allow a windfall to the lessee and the lessee's driver by allowing them to escape the full extent of their liability. They are incidental and contingent beneficiaries of insurance for which they did not pay. From a public policy standpoint, a lessee and a lessee's permissive user are in a better position than the lessor to prevent the underlying injury. Further, by not interposing the antisubrogation doctrine as a complete bar to recovery above the insured loss, it enables the parties to enforce the indemnification provision to which the lessor and lessee agreed in the leasing agreement and the assignment of claims provision in the agreement between the lessor and its insurer. This fosters New York's interest in promoting freedom of contract.[11] It is not the task of a federal court, sitting in diversity, to express a

---

10. On an interpretation of the policy language and the leasing agreement, the Court held that Reliance, the owner-lessor's primary insurer had provided the full amount of primary coverage to the lessee ($500,000). The Court construed the lessee's business auto primary policy with $500,000 limits and the owner-lessor's primary policy with $500,000 limits as providing primary coinsurance for the entire $900,000 loss. The lessee's primary insurer was required to reimburse the owner-lessor's excess carrier who had paid $400,000 towards the loss.

11. I am aware that an opinion concurred in by two Justices of the Appellate Division states, in a different context, that "the time has come for this Court to look at, 'the end which ought to be attained' and acknowledge that freedom of contract is a fiction when applied to insurance policies." *Great Canal Realty Corp. v. Seneca Insurance Co.*, 13 A.D.3d 227, 787 N.Y.S.2d 22, 27 (1st Dep't 2004) Whether such is the case when the Mercedes Benz Credit Corporation shops the market for insurance is not something I need to decide.

preference for either policy choice but rather to determine which path New York has elected to take. I conclude that New York would extend the *ELRAC* holding to a subrogation claim by an owner-lessor's insurer against the lessee and the lessee's permissive user and would permit the owner-lessor's insurer to recover for sums above its potential coverage of the lessee or the lessee's user.

I note that other federal cases, while not adopting the above line of reasoning (or even the same scope of the subrogation), have permitted the insurer of the owner-lessor to proceed against the lessee, despite an antisubrogation defense. *See Allianz v. Fresca*, 03–CV 1254(RLM) (E.D.N.Y.2004) (unreported) (lessee not an insured so that antisubrogation rule does not bar claim); *Allianz v. Cavagnuolo*, 03 Civ. 1636(HB) (S.D.N.Y. May 6, 2004) (unreported) (indemnification in MBCC auto lease fully enforceable in subrogation claim against lessee by Allianz as MBCC's subrogee); *Tokio Marine & Fire Insurance Co. v. Pagan*, 2003 WL 1858147 (S.D.N.Y. 2003) (same as *Fresca*); *Allianz Insurance Co. v. Lerner*, 296 F.Supp.2d 417 (E.D.N.Y.2003) (same as *Cavagnuolo*).

█ There remains the question in this case of whether the potential exposure of Allianz to Otero and Williamson was the statutory minimum $25,000 for bodily injury, Vehicle & Traffic Law § 370(1)(a), or $300,000 per occurrence required under the leasing agreement. The policy contains Endorsement 10, which facially provides that the policy affords no "insurance to the lessee and lessee's permissive users". If Endorsement 10 is carved back to the limits of New York public policy, the $25,000 per bodily injury minimum statutory amount would control. But Endorsement 12 has a stepdown provision, which indicates that the amount in the leasing agreement would control. On the unique

facts of this case, I do not need to resolve this issue. Chubb's policy was a $300,000 per occurrence policy. It was only after its limits were fully exhausted that Allianz, as MBCC's insurer, was called upon to pay any damages. The $200,000 Allianz paid was necessarily $200,000 over the first $300,000 paid by Chubb. Factually, whether the amount of Allianz's contingent insurance coverage of defendants were $25,000 or $300,000, it would be subsumed in the first $300,000 paid by Chubb as its primary policy limits. Allianz was not asked to pay any sum until Ms. McElroy's attorney had exhausted Chubb's exposure. None of the amount Allianz was called upon to pay fell within the layer of its contingent obligations to defendants.

I reject defendants' argument that the Allianz policy should be read as co-insurance with the Chubb primary policy. The Allianz policy provided contingent coverage to defendants in the event the lessee's coverage was "not in effect or not collectible." (Endorsement 10 at ¶ 1). This contingency was sufficient to call into play New York's antisubrogation rule but it did not make Allianz a co-insurer, standing side-by-side with Chubb. The logical extension of defendants' argument would make every lessor's insurer a co-insurer with every lessee's primary insurer, even when subrogation issues were not at stake. I find no basis for such a conclusion under New York law.

Accordingly (and subject to the issue of reasonableness), Allianz may recover against Otero and Williamson the $200,000 it paid in addition to the $300,000 paid by Chubb. I treat the duty to defend as falling within Allianz's potential or contingent coverage of defendants. At the time Allianz became aware of the claim, it potentially could have been liable to provide a defense to the defendants in the event Chubb had or subsequently developed a

basis to disclaim or, more remotely, its coverage became not collectible. Consistent with the above discussion, the cost of the defense provided to MBCC overlapped the contingent provision of a defense to defendants and, for this reason, is barred by the antisubrogation rule.

### The Reasonableness of the Settlement with the Insured Pedestrian

Defendants challenge the reasonableness of the settlement with the pedestrian, Ms. McElroy. According to Williamson's own handwritten statement, it was raining heavily and visibility was poor on April 16, 1999 at 7 p.m. His wipers and headlights were on. He was proceeding slowly at an intersection at West 80th Street and "I heard a scream coming from the left front of my car ... I jumped out and saw a woman lying in the street about a foot from the left front fender ... she kept saying my leg, my leg." Ms. McElroy, age 64, was taken by stretcher on to an ambulance and from there to St. Luke's Hospital. She was diagnosed with a comminuted and depressed lateral tibial plateau fracture of the right knee. She required surgery—open reduction and internal fixation of the fracture, in addition to allograft bone grafting. Chubb, the insurance carrier selected by Mr. Williamson's spouse, Ms. Otero, found the claim worthy of a $300,000 settlement. Allianz, who was contacted by Ms. McElroy's attorney, concluded that a settlement at a total sum of $500,000, with its own contribution of $200,000, was reasonable.

Williamson and Otero claim that the settlement was unreasonable. Having reviewed the submissions of each side, I find that they are not adequate to the task of determining whether I may rule on the issue as a matter of law in the context of the summary judgment motions, whether a hearing or trial is necessary and, if necessary, whether defendants are entitled to a jury. I will direct further submissions on these subjects.

### Spoliation

 Based upon the rather vague recollections of plaintiff's expert, defendants maintain that there was more to the Allianz claim file then has been produced, that it has been destroyed and that they have been prejudiced. Accordingly, they seek dismissal of all claims by reason of negligent spoliation of evidence. Having reviewed the computer-generated claim file and the other submissions of the parties on this motion, I conclude that defendants have not established sufficient prejudice to warrant the extreme remedy they seek.

### CONCLUSION

Plaintiff's motion for summary judgment is granted in part. Subject to a disposition of the reasonableness issue, plaintiff may recover $200,000 as against defendants but not plaintiff's attorneys' fees in investigating and defending the McElroy claim. Defendants' motion for summary judgment is denied in its entirety, except that, as noted, I will hear both sides on the reasonableness issue.

Parties may simultaneously submit supplemental memoranda on the reasonableness issue by January 28, 2005 and respond to each other's submission by February 11, 2005. Argument will be heard on March 4, 2005 at 4 p.m.

SO ORDERED.