**ALLSTATE INSURANCE COMPANY, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, Allstate New Jersey Insurance Company, Continental Insurance Company, Deerbrook Insurance Company, Encompass Indemnity Company, The Glens Falls Insurance Company, and National–Ben Franklin Insurance Company of Illinois, Plaintiffs,**

v.

Alexander ROZENBERG, M.D., A.R. Medical Rehabilitation, P.C., A.R. Medical Art, P.C., Yonkers Medical Art, P.C., Inna Polack, Alexander Polack, Yuliy Goldman, Natalya Shvartsman, Emmanuel Kucherovsky, Shaun Robinson (aka "Prince"), Yevgeniy Chertok, Yelena Dukach, Karina Dukach, Vladimir Kutsyk, Ilya Grinberg, Dimitriy Sheynkman, Mighty Management Group, Inc., Mighty Management, LLC, Blue Wave Management, Inc., Kevy's Management, Inc., First Neptune Management, Inc., Artek Management, Inc., M and Prestige Management Group, Inc., Defendants.

No. 08–CV–565 ADS ETB.

United States District Court, E.D. New York.

March 18, 2011.

Smith & Brink, P.C., by Richard Steigman, Esq., Michael W. Whitcher, Esq., Nathan A. Tilden, Esq., Richard D. King, Esq., of Counsel, Garden City, NY, for Plaintiffs.

Hoffman Einiger & Polland PLLC by Mark L. Furman, Esq., of Counsel, New York, NY, for Defendants Alexander Rozenberg, A.R. Medical Art, P.C., A.R. Medical Rehabilitation, P.C., and Yonkers Medical Art, P.C.

Belesi Donovan & Conroy by Maria Campese Diglio, Esq., of Counsel, Garden City, NY, for Defendants Inna Polack, Alexander Pollack, Mighty Management Group, Mighty Management, LLC, Natalya Shvartsman.

The Zuppa Firm PLLC by Raymond Joseph Zuppa, Esq., of Counsel, Brooklyn, NY, for Yevgeniy Chertok, Yelena Dukach, Karina Dukach, Ilya Grinberg.

Andrew Citron, Esq., New York, NY, for Artek Management, Inc., Dimitriy Sheynkman.

Revas Chachanashvili & Associates by Revaz Chachanashvili, Esq., of Counsel, Forest Hills, NY, for Artek Management, Inc.

SPATT, District Judge.

On February 12, 2008, the Plaintiffs, a group of nine insurers, commenced this action alleging that the numerous defendants conspired to abuse New York's No–Fault Insurance regime, N.Y. Ins. Law § 5101 et seq., in order to obtain payment for medical services and diagnostic tests that were not medically necessary, or in some cases, never performed at all. The Plaintiffs asserted common law claims for fraud and unjust enrichment, and sought damages for violations of N.Y. Gen. Bus. L. § 349, and violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 et seq. ("RICO").

In a decision dated December 29, 2008, this Court largely upheld the sufficiency of this complaint under Federal Rules of Civil Procedure 8(a) and 9(b), and in a series of subsequent decisions the Court granted the Plaintiffs' requests for prejudgment attachment of the defendants' assets. Subsequently, on April 21, 2010, the Plaintiffs filed a First Amended Complaint adding ten additional defendants that they allege were involved in the fraudulent scheme.

On July 21, 2010, two of the newly added defendants, Dimitriy Sheynkman ("Sheynkman") and Artek Management,

Inc. ("Artek" and together with Sheynkman "the Defendants") moved to dismiss the complaint against them pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)") for failure to plead their involvement in the fraudulent scheme with the particularity required by Federal Rule of Civil Procedure 9(b) ("Rule 9(b)"), and to dismiss the complaint as against Sheynkman pursuant to Federal Rules of Civil Procedure 12(b)(2) ("Rule 12(b)(2)"), 12(b)(4) ("Rule 12(b)(4)"), and 12(b)(5) ("Rule 12(b)(5)") for lack of personal jurisdiction, insufficient process, and insufficient service of process.

In addition, on April 22, 2010, the Plaintiffs filed their fourth motion for a prejudgment attachment seeking to attach the assets of the newly added defendants. With the exception of Sheynkman, Artek, and Prestige Management Group, Inc. ("Prestige"), all of the newly added defendants entered into stipulations with the Plaintiffs with respect to the prejudgment attachment of their assets.

In the interest of judicial economy, the Court will address both of these motions together. For the reasons set forth below, the Court denies Artek and Sheynkman's motion to dismiss, and denies in part and grants in part the Plaintiffs' fourth motion for prejudgment attachment on the assets of Prestige, Artek, and Sheynkman.

## I. BACKGROUND

The Court set forth the details of the Plaintiffs' allegations in this matter in its previous decision in this case, *Allstate Insurance Co. v. Rozenberg*, 590 F.Supp.2d 384 (E.D.N.Y.2008). Although familiarity with the factual background and procedural history of this case is assumed, a brief review is in order.

On February 12, 2008, the Plaintiffs, a group of nine insurers, commenced this action against Inna Polack, Alexander Polack, Natalya Shvartsman ("the Initial Management Defendants"), Mighty Management Group, Inc., Mighty Management LLC, and Blue Wave Management, Inc. ("the Initial Management Companies"), Dr. Alexander Rozenberg ("Rozenberg"), and A.R. Medical Rehabilitation, P.C. ("AR"), A.R. Medical Art, P.C. ("ARMA"), and Yonkers Medical Art, P.C. ("YMA" and together with AR and ARMA "the PC Defendants" and collectively with the Initial Management Defendants, the Initial Management Companies, and Rozenberg "the Initial Defendants"), alleging that they conspired to abuse New York's No–Fault Insurance regime, N.Y. Ins. Law § 5101 et seq., in order to obtain payment for medical services and diagnostic tests that were not medically necessary, or in some cases, never performed at all (the "Initial Complaint"). With the exception of ARMA and YMA, all of the Initial Defendants were also subject to a criminal indictment with respect to their participation in the allegedly fraudulent scheme.

As stated in previous decisions, the basics of the alleged scheme are as follows. The PC Defendants are medical professional corporations that billed the Plaintiffs for consultations and medical procedures performed upon patients insured by the Plaintiffs. According to the Plaintiffs, Rozenberg, a licensed neurologist, was listed as the owner of the PC Defendants, but played no role in the actual operation or management of the PC Defendants. Rather, in the Initial Complaint, the Plaintiffs asserted that the PC Defendants were owned and operated by the Initial Management Companies; namely, New York corporations that are owned and controlled by Yuliy Goldman, Inna Polack and Alexander Polack. The Plaintiffs alleged that the sole purpose of the relationship between the PC Defendants and the Initial Management Companies was to facilitate a scheme to defraud the Plaintiffs by creating and submitting fraudulent medical reports and invoices for medical services in

support of hundreds of No–Fault insurance claims. The Plaintiffs also alleged that Inna Polack, Alexander Polack, and Rozenberg created the PC Defendants with different names, addresses, and taxpayer identification numbers to reduce the likelihood that insurers would uncover their scheme.

In particular, the Plaintiffs asserted that the Initial Defendants submitted bills for services not rendered; charged excessive fees for unnecessary medical treatment; and induced Allstate and the other insurers to pay No–Fault insurance claims to professional medical corporations that were owned by non-licensed individuals. The Plaintiffs further alleged that checks were drawn from the accounts of the Initial Management Companies and made payable to corporations owned or controlled by Emmanuel Kucherovsky (the "money laundering entities") who, for a transaction fee, transferred these monies to Inna Polack.

In the Initial Complaint, the Plaintiffs alleged that the Initial Defendants (i) violated RICO, 18 U.S.C. § 1962(c); (ii) engaged in a RICO conspiracy in violation of 18 U.S.C. § 1962(d); (iii) committed common law fraud and unjust enrichment; and (iv) were liable under N.Y. Gen. Bus. L. § 349 for deceptive business practices. The Initial Defendants filed motions to dismiss the Initial Complaint in April and June of 2008. By order dated December 29, 2008, this Court denied the motions as to all counts with the exception of the cause of action alleging a RICO conspiracy under the Innocent Enterprise Theory. *See generally Allstate Insurance Co. v. Rozenberg*, 590 F.Supp.2d 384 (E.D.N.Y. 2008). In addition, by order dated January 26, 2009, *Allstate Ins. Co v. Rozenberg*, No. 08–CV–565, Docket No. 119 (E.D.N.Y. Jan. 26, 2009) (the "January 26, 2009 Order") and subsequent amendments, the Court granted the Plaintiffs' requests for prejudgment attachments on the assets of the Initial Defendants based upon a showing of a likelihood of success on the merits and the existence of one or more of the enumerated statutory grounds for attachment under N.Y. C.P.L.R. § 6201 ("CPLR § 6201").

Based on information they purportedly uncovered during the discovery process, on April 21, 2010, the Plaintiffs filed an amended complaint to add ten additional management defendants that the Plaintiffs allege were involved in the ownership and control of the PC Defendants (the "Amended Complaint"). Specifically, the Plaintiffs amended the complaint to add the following defendants and allegations:

- Kevy's Management ("Kevy's"), and Yevgeniy Chertok, Yelena Dukach, Karina Dukach, and Vladimir Kutsyk who allegedly owned and controlled Kevy's. The Plaintiffs allege that, since January 2001, Kevy's was used by its owners as a tool to illegally own and control AR and to siphon-off revenues generated by AR through billings submitted to the Plaintiffs for healthcare services. (Am. Compl., ¶¶ 73–75.)

- Prestige Management Group, Inc., allegedly owned and controlled by Inna Polack. The Plaintiffs allege that since 2000, Prestige was used as a tool to illegally own and control AR and to siphon-off revenues generated by AR through billings submitted to the Plaintiffs for healthcare services. (Am. Compl., ¶¶ 76–78.)

- First Neptune Management, Inc. ("First Neptune"), and Ilya Grinberg ("Grinberg"), who along with Vladimir Kutsyk ("Kutsyk") owned and controlled First Neptune. The Plaintiffs allege that, since at least 2002, First Neptune was used by its owners as a tool to illegally own and control YMA and to siphon-off revenues generated by YMA through billings submitted to

the Plaintiffs for healthcare services. (Am. Compl., ¶¶ 79–81.)

- Artek Management, Inc. and Dimitriy Sheynkman who allegedly owned and controlled Artek. The Plaintiffs allege that, since at least 2002, Artek was used by Sheynkman as a tool to illegally own and control YMA and to siphon-off revenues generated by YMA through billings submitted to Allstate for healthcare services. (Am. Compl., ¶¶ 82–84.)

On July 21, 2010, Sheynkman and Artek filed a motion to dismiss asserting that: (1) pursuant to Rule 12(b)(2), 12(b)(4), and 12(b)(5) the Court lacked personal jurisdiction over Sheynkman because he was not properly served under New York law and (2) pursuant to Rule 12(b)(6), the Plaintiffs failed to plead Arek and Sheynkman's role in the alleged fraudulent scheme with the level of specificity required by Rule 9(b). The Court addresses these arguments in turn below.

In addition, on April 22, 2010, the Plaintiffs filed a fourth motion for prejudgment attachment on the assets of the newly added defendants. The Plaintiffs subsequently entered in to stipulations with respect to the requested prejudgment attachment on the assets of Yevgeniy Chertok, Karina Dukach, Vladimir Kutsyk, Ilya Grinberg, Kevy's and First Neptune. Accordingly, the motion as to those defendants is moot. However, the Plaintiffs did not enter into stipulations with Sheynkman, Artek, or Prestige, and thus, the Court will also address the merits of the Plaintiffs' motion as to these defendants in this decision.

## II. DISCUSSION

### A. Sheynkman's Motion to Dismiss Pursuant to Fed.R.Civ.P. 12(b)(2), 12(b)(4) and 12(b)(5)

Sheynkman seeks dismissal of the complaint for lack of personal jurisdiction under Rule 12(b)(2), insufficient process under Rule 12(b)(4), and insufficient service of process under Rule 12(b)(5). Specifically, Sheynkman alleges that the court lacks personal jurisdiction over him because the Plaintiffs failed to utilize the requisite due diligence required under New York law before resorting to a form of service referred to as "nail and mail."

"On a Rule 12(b)(5) motion to dismiss, the plaintiff bears the burden of establishing that service was sufficient." *Khan v. Khan,* 360 Fed.Appx. 202, 203 (2d Cir.2010) (citing *Burda Media, Inc. v. Viertel,* 417 F.3d 292, 298 (2d Cir.2005)). Service of process on an individual within a judicial district of the United States may be completed by "following the state law for serving summons in an action brought in courts of general jurisdiction in the state where the district court is located or where service is made." Fed.R.Civ.P. 4(e)(1). Here, where the case has been brought in the Eastern District of New York and Sheynkman was served in Kings County, New York, service of the complaint on Sheynkman was governed by New York law.

Under New York law, service of process is governed by CPLR § 308, which provides that: (1) individuals may be served by delivering the summons to the person to be served, *see* CPLR § 308(1), or (2) by delivering the summons "to a person of suitable age and discretion at the actual place of business, dwelling place, or usual place of abode of the person to be served," along with mailing the summons to the person's last known address of residence, *see* CPLR § 308(2). When a process server is unable to properly serve a party under subsections (1) and (2) of the statute, the process server may use a procedure outlined in CPLR § 308(4) commonly referred to as "nail and mail," which states:

where service under paragraphs one and two cannot be made with *due diligence,* by affixing the summons to the door of either the actual place of business, dwelling place or usual place of abode within the state of the person to be served and by either mailing the summons to such person at his or her last known residence or by mailing the summons by first class mail to the person to be served at his or her actual place of business . . .

CPLR § 308(4) (emphasis added). Here, the parties dispute whether the Plaintiffs used the requisite "due diligence" in attempt to personally serve Sheynkman or a person of suitable age and discretion at his residence of place of business under CPLR §§ 308(1) or 308(2) before resorting to CPLR § 308(4).

■ New York courts have not adopted a per se rule as to what constitutes "due diligence" under Section 308. Rather, whether attempts to effectuate service constitute due diligence is determined on a case-by-case basis. *See Barnes v. City of New York,* 51 N.Y.2d 906, 907, 415 N.E.2d 979, 434 N.Y.S.2d 991 (N.Y.1980); *Estate of Waterman v. Jones,* 46 A.D.3d 63, 66, 843 N.Y.S.2d 462, 464 (2d Dep't 2007). However, "the due diligence requirement of CPLR 308(4) must be strictly observed, given the reduced likelihood that a summons served pursuant to that section will be received." *McSorley v. Spear,* 50 A.D.3d 652, 653, 854 N.Y.S.2d 759 (2d Dep't 2008). When determining whether the process server's actions constitute due diligence, courts should not focus on the quantity of the attempts at personal delivery, but on their quality. *Id.* Relevant to the instant case, is that failed attempts to make delivery at a person's residence will normally not qualify as due diligence unless the process server has also tried to ascertain the person's place of employment. *See O'Connell v. Post,* 27

A.D.3d 630, 631, 811 N.Y.S.2d 441 (2d Dep't 2006).

■ The attempts by the Plaintiffs process server to serve Sheynkman pursuant to CPLR §§ 308(1) and 308(2) are set forth in the Affidavit of Service of Jay Mitchell ("Service Affidavit"). (*See* Docket # 369). The parties do not dispute the accuracy of the Service Affidavit, which provides that on four separate occasions—Thursday, April 29, 2010 at 8:33PM; Saturday, May 1, 2010 at 11:30AM; Wednesday, May 5, 2010 at 7:18AM; and Friday, May 7, 2010 at 1:15PM—the Plaintiffs' process server attempted to serve Sheynkman at his Kings County residence without success. The Service Affidavit further documents that, during the final service attempt on May 7, 2010, the process server spoke with the mailman, "Mr. Smith," who confirmed Sheynkman's residence, but, when asked by the process server if he knew where Sheynkman worked, was "unable to divulge [Sheynkman's] place of employment." Having failed to personally serve Sheynkman or a person of suitable age and discretion at Sheynkman's residence or place of business, the process server utilized the "nail and mail" procedure as set forth in CPLR § 308(4) by affixing a copy of the requisite documents to the door of Sheynkman's residence and mailing a copy by regular first class mail. Here, Sheynkman contends that service was insufficient because, by only inquiring about his place of business from the mailman, the Plaintiffs did not exercise due diligence in attempting to ascertain his place of business.

To determine whether the Plaintiffs exercised due diligence before resorting to "nail and mail" service, the Court must look to the totality of the circumstances. As an initial matter, the Court notes that other courts have found that similar circumstances satisfied the due diligence re-

quirement for "nail and mail" service. For example, in *Allianz Insurance Co. v. Otero*, 353 F.Supp.2d 415, 420 (S.D.N.Y.2004), the court found that due diligence was satisfied where, after three attempts of personal delivery, the process server inquired with a neighbor who confirmed that the defendant lived at the address, but could not provide the defendant's place of employment. Whether a neighbor is more likely to know a defendants place of employment rather than a mailman is irrelevant to the analysis in that in both situations, the individuals knew of the person's residence, but not their place of employment. The Court agrees with the court in *Otero* that while the Plaintiffs "might have pursued other avenues to learn [Sheynkman's] place of employment, [they] [were] not required to exercise the utmost diligence." *Id.* at 421.

Moreover, even without speaking to a neighbor or mailman, due diligence can be satisfied when there are quality attempts at delivery that include times in which it is likely that the person to be served would be available. *See, e.g., Nassau County v. Gallagher*, 43 A.D.3d 972, 841 N.Y.S.2d 696 (2d Dep't 2007) ("When four attempts to serve the defendant at his residence included an attempt on a late weekday evening and an attempt on an early Saturday morning, it was not necessary that the plaintiff attempt to serve the defendant at his workplace"). Here, the process servers attempts to serve Sheynkman included a weekday evening and Saturday morning, as well as in the early morning and afternoon of a weekday. Accordingly, the Court finds that the Plaintiffs used due diligence to attempt personal service on Sheynkman or someone of a suitable age at his residence or place of employment before resorting to the "nail and mail" provision of CPLR § 308(4) and therefore denies Sheynkman's motions to dismiss pursuant to Rules 12(b)(2), 12(b)(4) and 12(b)(5).

## B. Sheynkman and Arteks Rule 12(b)(6) Motion to Dismiss For Failure to Plead Fraud

In the Amended Complaint, the Plaintiffs allege that Sheynkman and Artek, among other acts, violated the RICO provisions and committed common law fraud by engaging in a scheme to defraud the Plaintiffs of No–Fault insurance premiums through their alleged ownership and control of YMA. Both Sheynkman and Artek moved to dismiss the complaint pursuant to Rule 12(b)(6) for failing to plead their role in the alleged fraud with the requisite specificity required by Rule 9(b). In particular, the Defendants argue that the Plaintiffs have not pled with the requisite particularity that the revenue Sheynkman and Artek received from YMA was derived from ownership and control of YMA and participation in the fraudulent scheme, as opposed to legitimate arms length business transactions.

### 1. The Legal Standard and Pleading Requirements for the Rule 12(b)(6) Motion to Dismiss for Failure to Plead Fraud

Under the well-established *Twombly* standard, a complaint should be dismissed only if it does not contain enough allegations of fact to state a claim for relief that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007). The Second Circuit has explained that, after *Twombly*, the Court's inquiry under Rule 12(b)(6) is guided by two principles. *Harris v. Mills*, 572 F.3d 66 (2d Cir.2009) (quoting *Ashcroft v. Iqbal*, —— U.S. ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009)).

"First, although 'a court must accept as true all of the allegations contained in a complaint,' that 'tenet' 'is inapplicable to legal conclusions' and 'threadbare recitals of the elements of a cause of action, sup-

ported by mere conclusory statements, do not suffice.'" *Id.* (quoting *Iqbal*, 129 S.Ct. at 1949). "'Second, only a complaint that states a plausible claim for relief survives a motion to dismiss' and '[d]etermining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Id.* (quoting *Iqbal*, 129 S.Ct. at 1950). Thus, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and ... determine whether they plausibly give rise to an entitlement of relief." *Iqbal*, 129 S.Ct. at 1950.

■ The substantive RICO statute, 18 U.S.C. § 1962(c), makes it "unlawful for any person employed by or associated with any enterprise engaged in ... interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity ..." To establish a RICO violation under 18 U.S.C. § 1962(c), a plaintiff must show: "(1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invests in, or participates in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce." *Moss v. Morgan Stanley Inc.*, 719 F.2d 5, 17 (2d Cir.1983). In the instant litigation, the Plaintiffs allege that mail fraud is one of the predicate criminal acts by the Defendants, which constitutes "racketeering activity" for the purposes of the RICO violation. *See S.Q.K.F.C., Inc. v. Bell Atlantic TriCon Leasing Corp.*, 84 F.3d 629, 633 (2d Cir.1996). The only aspect of the RICO claim that the Defendants challenge in the present motion is that the predicate act of mail fraud is not pled with the requisite specificity required by Rule 9(b).

■ A plaintiff asserting a mail fraud claim must show: (1) "the existence of a scheme to defraud, (2) defendant's knowing or intentional participation in the scheme, and (3) the use of interstate mails or transmission facilities in furtherance of the scheme." *Id.* It is well-settled that a complaint alleging fraud must comply with the heightened pleading standard under Rule 9(b) which requires that "the circumstances constituting fraud ... must be stated with particularity." *See* Fed. R.Civ.P. 9(b); *see also Ganino v. Citizens Util. Co.*, 228 F.3d 154, 168 (2d Cir.2000). In order to satisfy the particularity requirement of Rule 9(b), the complaint must: "'(1) specify the statements that the plaintiff contends were fraudulent; (2) identify the speaker; (3) state where and when the statements were made; and (4) explain why the statements were fraudulent.'" *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir.2006) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir.1993)). In addition, the complaint must "provide some minimal factual basis" that gives rise to a strong inference of fraudulent intent. *Powers v. British Vita, P.L.C.*, 57 F.3d 176, 184 (2d Cir. 1995).

■ In the instant case, the Plaintiffs have alleged that the Defendants participated in the fraudulent scheme both through mail fraud associated with their illegal ownership of YMA ("fraudulent incorporation"), and mail fraud associated with billing for fraudulent medical services ("fraudulent billing"). As discussed below, neither of these allegations of fraud required the Plaintiffs to plead that the specific claims sent through the mail for payment to the Plaintiffs that generated the revenue for the Defendants contained fraudulent information about the medical services provided.

■ With respect to the causes of action premised on fraudulent billing, when there are multiple defendants, Rule

9(b) requires that a plaintiff allege facts specifying each defendant's contribution to the fraud. *See DiVittorio v. Equidyne Extractive Indus., Inc.,* 822 F.2d 1242, 1247 (2d Cir.1987). However, in the context of a RICO action, the complaint "need not be specific as to each allegation of mail or wire fraud when the nature of the RICO scheme is sufficiently pleaded so as to give notice to the defendants." *First Interregional Advisors Corp. v. Wolff,* 956 F.Supp. 480, 485 (S.D.N.Y.1997). Accordingly, the Plaintiffs were not required to particularize which of the reimbursed invoices contained fraudulent information. When, in a complex civil RICO case, the mail is used "in furtherance of a master plan to defraud, the mailings need not contain fraudulent information, and a detailed description of the underlying scheme and the connection therewith of the mail and/or wire communications is sufficient to satisfy Rule 9(b)." *AIU Ins. Co. v. Olmecs Medical Supply, Inc.,* No. 04–CV–2934, 2005 WL 3710370, at *11 (E.D.N.Y. Feb. 22, 2005).

With respect to the fraudulent incorporation allegations, under New York's No-Fault Laws, "[o]nly properly licensed professional corporations-those owned and operated by medical professionals-are eligible for reimbursement." *Allstate Ins. Co. v. Halima,* No. 06–CV–1316, 2009 WL 750199, at *1 (E.D.N.Y. March 19, 2009) (citing N.Y. Bus. Corp. Law §§ 1507–108); *State Farm Mut. Auto. Inc. Co. v. Mallela,* 4 N.Y.3d 313, 321–22, 794 N.Y.S.2d 700, 827 N.E.2d 758 (2005) (holding that medical professional services corporations must be owned and operated solely by licensed physicians). Here, the Plaintiffs have alleged that, in order to facilitate the fraudulent scheme, the Defendants, among others, incorporated YMA under Rozenberg's name despite the fact that they would retain true ownership and control, specifically to circumvent this prohibition against non-licensed laypersons receiving No-Fault benefits under New York law.

The New York Court of Appeals' decision in *Mallela,* has been read to implicitly hold that an insurer can bring an action for fraud based on fraudulent incorporation under N.Y. Insurance Law § 5106(a), "to recover payments already made to fraudulently incorporated providers." *State Farm Mut. Auto. Ins. Co. v. Grafman,* 655 F.Supp.2d 212, 220 (E.D.N.Y.2009); *State Farm Mut. Auto. Ins. Co. v. Rabiner,* 749 F.Supp.2d 94, 98–99 (E.D.N.Y.2010) (noting that the court in *Mallela* "held that fraudulently incorporated medical corporations were not entitled to reimbursement of No–Fault benefits and recognized that insurers could maintain a cause of action for fraud or unjust enrichment to recoup such payments"); *AIU Ins. Co. v. Deajess Medical Imaging, P.C.,* 24 Misc.3d 161, 167–68, 882 N.Y.S.2d 812, 818 (N.Y.Sup.Ct.2009) (stating that in *Mallela,* "[t]he court indicated that mere failure to observe corporate formalities would not render the provider ineligible .... [h]owever, 'willful and material failure to abide by state and local law,' conduct tantamount to fraud, would render the provider ineligible for no fault reimbursement") (quoting *Mallela,* 4 N.Y.3d at 320, 321, 794 N.Y.S.2d 700, 827 N.E.2d 758). Indeed, "New York's licensing requirements were enacted to prohibit the 'corporate practice of medicine' that could result in the conduct alleged here, i.e., fraudulent practices such as billing for treatments that were not provided or were medically unnecessary." *State Farm Mut. Auto. Ins. Co. v. Accurate Medical, P.C.,* No. 07–CV–051, 2007 WL 2908205, at *3 (E.D.N.Y. Oct. 4, 2007) (citing *State Farm Mut. Auto. Ins. Co. v. Mallela,* 372 F.3d 500, 502 (2d Cir.2004)).

Accordingly, to plead a claim for relief based on fraudulent incorporation, the

Plaintiffs were not required to plead that the material misrepresentations were for fraudulent medical services. Rather, the Plaintiffs were only required to allege with specificity that the material misrepresentations were fraudulent because the Defendants were not entitled to recover the No–Fault benefits. *See Grafman,* 655 F.Supp.2d at 221 (holding that when pleading a cause of action for fraudulent incorporation where the "damages stem from the alleged fraudulent misrepresentation that the [defendants] were properly incorporated" a plaintiff is not required in the complaint to "detail the injury suffered, including the nature of the claims in question, by date of service, claim number, or even patient name") (internal quotation marks omitted); *Rabiner,* 749 F.Supp.2d at 101–03 (holding that to state a claim for unjust enrichment based on No–Fault insurance payments made to an improperly licensed professional corporation, the plaintiff was not required to allege "that the medical services that were the subject of the challenged claims were medically unnecessary or not rendered").

### 2. Whether the Plaintiffs' Have Adequately Pled the Defendants' Involvement in the Fraudulent Scheme

 As the Court has previously held, the Plaintiffs adequately pled in the Initial Complaint a detailed description of the underlying fraudulent scheme; YMA's specific role in that scheme; and YMA's fraudulent misrepresentations in furtherance of that scheme. *See Rozenberg,* 590 F.Supp.2d at 390 ("The Plaintiffs have described the allegedly fraudulent scheme, and each Defendant's role in the scheme, in detail. In fact, the complaint includes exhibits detailing the dates and specific instances of fraudulent submissions mailed by the Defendants. The complaint also alleges that each of the Defendants are connected to the scheme such that each

defendant could have reasonably foreseen that use of the mail was an essential element of the alleged fraud.") (citing *United States v. Bortnovsky,* 879 F.2d 30, 36 (2d Cir.1989)).

Furthermore, the Defendants do not appear to dispute, nor could they, that the Plaintiffs have adequately pled that the alleged fraud was perpetrated using the mail. In the Amended Complaint, the Plaintiffs identify the statements that they contend were fraudulent. Specifically, the Plaintiffs allege that, among other things, the material misrepresentations were contained in insurance claim forms ("NF–3 forms"), as well as other forms of medical documentation such as medical billing invoices and medical records, that were mailed to the Plaintiffs demanding payment for the medical procedures purportedly performed at YMA. (Am. Compl., ¶¶ 696, 699).

In addition, it is also beyond dispute that the Plaintiffs have sufficiently identified where and when the statements were made. In this regard, the Plaintiffs attached a number of exhibits to the Amended Complaint, which the Court can properly consider on a Rule 12(b)(6) motion to dismiss. *See DiFolco v. MSNBC Cable L.L.C.,* 622 F.3d 104, 111 (2d Cir.2010) ("In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint."). These exhibits included a chart showing selected examples of dates when NF–3 forms were sent to the Plaintiffs from a PC Defendant for payment (Am. Compl., Ex. 12). In addition, the exhibits include three charts showing payments from the Plaintiffs to the PC Defendants, including YMA, in response to NF–3 forms and other medical documentation

that the PC Defendants submitted to the Plaintiffs for medical expenses and/or services (Am. Compl., Exs. 13–15). Although these charts are not necessary to adequately plead a RICO claim based on mail fraud, *see, State Farm Mut. Automobile Ins. Co. v. CPT Med. Servs., P.C.,* No. 04–CV–5045, 2008 WL 4146190, at *12 (E.D.N.Y. Sept. 5, 2008), they provide an additional layer of particularity that support the sufficiency of the Amended Complaint under Rule 9(b).

Thus, the relevant issue before the Court is whether the Plaintiffs have adequately alleged that Sheynkman and Artek owned and controlled YMA, and that they were involved in the underlying fraudulent scheme. The Defendants argue that the allegations in the Amended Complaint with respect to their relationship with YMA and association with the underlying scheme are conclusory and fail to allege that the revenue they received from YMA was not for legitimate business transactions. The Court disagrees.

YMA was identified in the Initial Complaint as one of the medical clinics of which Rozenberg falsely purported to be the sole owner, officer, and director. The Plaintiffs contend that they learned during the discovery process that YMA was actually controlled by certain nonmedical professionals and managements companies, namely First Neptune, which was owned and controlled by Ilya Grinberg and Vladimir Kutsyk, and by Artek, which was owned and controlled by Sheynkman (collectively the "YMA Managers"). Accordingly, the Plaintiffs amended the complaint to assert that the YMA Managers, as part of the overall scheme, used YMA to do indirectly what they, as non-medical professionals and management companies, were forbidden from doing directly under New York Insurance Law, specifically: (1) employing physicians and other licensed healthcare professionals; (2) controlling their prac-

tices; and (3) charging for their services. (Am. Compl., ¶ 178.) In the Amended Complaint, the Plaintiffs have set forth in detail the description of the underlying scheme; the Defendants involvement in that scheme; and how the scheme was facilitated through medical records, invoices, and other documentation sent through the mail.

With respect to the Defendants' ownership and control of YMA, the Plaintiffs allege, among other things, that: (1) since 2002, Sheynkman a non-licensed layperson used his management company Artek as a tool to illegally own and control YMA through the use of management and/or consulting agreements; (2) since at least 2003, First Neptune and Artek, through their respective owners including Sheynkman, controlled YMA and used it to employ physicians and other licensed healthcare professionals, to control their practices, and charge for their services; and (3) through their ownership and control of YMA, Sheynkman and Artek illegally siphoned-off revenues of $1,243,256.00 generated by YMA through billing submitted to the Plaintiffs for healthcare services.

In addition, the Plaintiffs set forth a number of allegations detailing how the defendants, including Sheynkman and Artek, used their control of the PC Defendants to facilitate the fraudulent billing. For example, the Plaintiffs state in the Amended Complaint that the YMA Managers, including Sheynkman and Artek, installed non-medical personnel at YMA to "enforce a pre-established regimen of treatment without regard to medical necessity, for the sole purpose of maximizing YMA's billings so that the revenue could be siphoned-off to [the YMA Managers]." (Am. Compl., ¶ 182.) The Plaintiffs then explained the details of how all of the defendants, which would include Sheynk-

man and Artek, allegedly implemented the fraudulent billing scheme through billing for "substantially similar evaluations, treatments, and testing regarding of the nature of the alleged injuries." (Am. Compl., ¶ 772.) In addition, the defendants were alleged to have devised a system where upon a patient's initial office consultation at the PC Defendants, it would trigger "a series of internal billing practices and procedures in which the PC Defendants would bill for services . . . regardless of necessity of the individualized medical needs of the patient." (Am. Compl., ¶ 773.) Also, the initial consultation would allegedly trigger "automatic billing for follow-up examinations, testing and treatment regimen that the PC Defendants would bill for regardless of whether the patients appeared, or the examinations, testing and treatments were medically necessary." (Am. Compl.¶ 774.)

Accepting these facts as true, which the Court must on a motion to dismiss, the Plaintiffs have met their burden of plausibly alleging the Defendants role in the mail fraud both with respect to fraudulent billing and fraudulent incorporation. The Plaintiffs have alleged in detail that the Defendants, who were non-licensed medical professionals, as opposed to Rozenberg, owned and controlled YMA for the purpose of circumventing New York's No–Fault laws. The Plaintiffs further alleged in detail how the Defendants' services to YMA were fraudulent and not legitimate arms length business transactions both through the allegations detailing how the fraudulent bills were created, and the allegation that they siphoned-monies from YMA. Viewed in the context of the detailed description of the fraudulent scheme as a whole, these allegations are sufficient to plausibly allege that the Defendants owned and controlled YMA and the Defendants involvement in the fraudulent scheme. *See State Farm Mut. Auto. Ins. Co. v. Grafman,* 655 F.Supp.2d 212 (E.D.N.Y.

2009) ("To the contrary, the allegations that defendants siphoned monies, and collected kickbacks, from Milan, especially when viewed in light of the detailed description of how and why Milan was fraudulently incorporated, are sufficient to survive a motion to dismiss.").

The Defendants assert that the plausibility that they were involved in the fraud is undermined by the fact that the Amended Complaint contains fewer factual allegations regarding their involvement in the fraud than that alleged as to other defendants, specifically those that were criminally indicted for their role in the scheme. As Artek and Sheynkman correctly note, they are the only defendants without specific allegations of money laundering levied against them. However, these arguments go to the relative role that the Defendants played in the scheme, not the plausibility of their involvement in the scheme.

Furthermore, that Artek and Sheynkman are not alleged to have been the sole owners and managers of YMA, does not change the fact that they were allegedly complicit in and derived revenue from the invoices submitted to the Plaintiffs under the auspices of a medical company owned and operated by a licensed physician. *See CPT Med. Servs.,* 2008 WL 4146190, at *12 (holding that the plaintiff had adequately plead fraudulent intent as to all defendants under similar factual circumstances where "the motive shared by all defendants was to induce State Farm to pay claims that were otherwise not reimbursable, and for their efforts they received payments, either directly from State Farm, or indirectly as kickbacks disguised as 'management fees' "); *Allstate Ins. Co. v. Halima,* No. 06–CV–1316, 2009 WL 750199, at *5 (E.D.N.Y. March 19, 2009) (holding that allegations nearly identical to those at issue here "sufficiently set forth the role of the [specific management

defendants] and the acts of fraud they are alleged to have committed"). As the court noted in *Halima*, the conduct that Sheynkman and Artek to alleged to have committed "is exactly the sort of conduct sought to be discouraged by the requirement that only physicians own and operate medical professional corporations" and therefore "requiring Plaintiffs to plead with more particularity would not further any of the policy goals of Rule 9(b)." *Id.*

In addition, the Defendants contend that the fact that $1,243,256.00, the amount received by Artek and Sheynkman from YMA, breaks down to receiving approximately $150,000 per year, which "amounts to less than the salary of a first year associate at a major law firm on an annual basis . . . practically disproves fraud." (Defs.' Reply Br. at 3, 5.) However, as even a "first year associate at a major law firm" would know, there is no profit threshold required to adequately allege fraud.

Finally, the Defendants seek to have the Court accept Inna Polack's deposition testimony in which she disclaimed knowledge of Artek as evidence that Artek was not involved in fraud. However, Ms. Polack's deposition transcript was attached as an exhibit to the Plaintiffs' fourth motion for prejudgment attachment, not to the Amended Complaint. It is well settled that a Court cannot consider documents outside the pleadings on a Rule 12(b)(6) motion to dismiss unless the documents are incorporated by reference in the complaint or are integral to the complaint. "To be incorporated by reference, the complaint must make a clear, definite and substantial reference to the documents . . . . [and] [t]o be integral to a complaint, the plaintiff must have (1) actual notice of the extraneous information and (2) relied upon the documents in framing the complaint." *DeLuca v. AccessIT Group, Inc.*, 695 F.Supp.2d 54, 60 (S.D.N.Y.2010) (internal quotation marks, citations, and alterations omitted); *see Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir.2002); *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir.1991).

Here, the Amended Complaint does not make any reference to Ms. Polack's deposition or her knowledge of the Defendants. Furthermore, the Plaintiffs do not purport to have relied on Ms. Polack's deposition in crafting the allegations in the Amended Complaint relating to the Defendants. Rather, the Plaintiffs assert that the allegations against the Defendants are based on "voluminous financial records obtained through discovery [that] outlines the 'business' relationship between Rozenberg, YMA, Sheynkman, and Artek." (Pls.' Opp. at 5.) Accordingly, Ms. Polack's deposition cannot be considered "incorporated by reference" or "integral" to the complaint, and therefore the Court may not consider it in a Rule 12(b)(6) motion to dismiss and the Court declines to convert the motion to one for summary judgment in order to consider this material. *See Fonte v. Bd. of Managers of Cont'l Towers Condo.*, 848 F.2d 24, 25 (2d Cir.1988).

Accordingly, the Court denies the Defendants' Rule 12(b)(6) motion to dismiss the Amended Complaint for failure to plead their role in the alleged fraudulent scheme with the particularity required by Rule 9(b).

### C. Motion for Prejudgment Attachment of Assets

On January 26, 2009, and in subsequent amendments, the Court granted the Plaintiffs' motion for prejudgment attachment as to Inna Polack, Alexander Polack, Emmanuel Kucherovsky, the Initial PC Defendants, and the Management companies. Relying on the Court's findings in the January 26, 2009 Order, the Plaintiffs seek an

order attaching the assets of Prestige, Artek, and Sheynkman.

"Under New York law, to obtain an order of attachment, the moving party must demonstrate that (1) it has a cause of action for a money judgment, (2) there is a probability of success on the merits, (3) one or more of the enumerated statutory grounds for attachment under CPLR § 6201 exists, and (4) the amount demanded exceeds the amount of all counterclaims known to the party seeking attachment." *Nanjing Textiles IMP/EXP Cor., Ltd. v. NCC Sportswear Corp.*, No. 06–CV–52, 2006 WL 2337186, at *4 (S.D.N.Y. Aug. 11, 2006) (citing N.Y. CPLR §§ 6201, 6212(a)). The statutory ground under CPLR § 6201 applicable in the instant case is section 6201(3) which provides that an order of attachment may be granted when:

> the defendant, with intent to defraud his creditors or frustrate the enforcement of a judgment that might be rendered in plaintiff's favor, has assigned, disposed of, encumbered or secreted property, or removed it from the state or is about to do any of these acts

N.Y. C.P.L.R. § 6201(3) (McKinneys 2010). Under the provision of CPLR § 6201(3), "a plaintiff must prove two elements: (1) that defendant either is about to or has assigned, disposed of, encumbered, or secreted property, or removed it from the state, and (2) that defendant has acted or will act with the intent to defraud her creditors or to frustrate the enforcement of a judgment that might be rendered in plaintiff's favor." *Encore Credit Corp. v. LaMattina*, No. 05–CV–5442, 2006 WL 148909, at *3 (E.D.N.Y. Jan. 18, 2006).

Central to the Court's January 26, 2009 decision to order the prejudgment attachment of the assets of Inna Polack, Alexander Polack, Emmanuel Kucherovsky and the Initial PC Defendants was the evidence of the money laundering scheme. Specifically, this Court noted that:

> With respect to the evidence of money laundering, the Plaintiffs have shown that once the PC Defendants received payment for medical services, Inna Polack directed these funds to the Management Companies. The Plaintiffs have also shown that the Management Companies in turn funneled the money to shell companies created by Emmanuel Kucherovsky who instructed Polack and the Management Companies to structure their transactions to as to avoid currency reporting requirements. . . . *By presenting evidence of this money laundering scheme*, the Plaintiffs have made a prima facie showing that the Polacks, the PC Defendants, the Management Companies, and Kucherovsky secreted assets for the purpose of evading creditors.

January 26, 2009 Order at 13. (emphasis added). Thus, this Court held that the evidence of the money laundering scheme, in connection with evidence of specific actions taken by Inna and Alexander Polack that provided circumstantial evidence of the Polacks' intent to move their assets in order to frustrate a judgment, was sufficient to satisfy the Plaintiffs' burden under CPLR § 6201(3).

▬ With respect to Prestige, the Plaintiffs have established a likelihood of success on the merits. The relationship between Prestige, Inna Polack, and AR is set forth in exacting detail in the Amended Complaint. Given the sufficiency of the Amended Complaint with respect to Prestige, the Court finds that its analysis in the January 26, 2009 Order with respect to likelihood of success on the merits as to Ms. Polack and AR is also applicable to Prestige. Furthermore, the Court finds that the Plaintiffs have shown that the attachment of Prestige's assets are permissible under CPLR § 6201(3). The Plaintiffs have set forth evidence of Pres-

tige's involvement in the money laundering scheme (*see* Pls.' Fourth Attachment Motion, Exs. 8, 9) as well as Inna Polack's direct involvement with Prestige Management (*Id.* at Ex. B). Accordingly, the Court grants the Plaintiffs' request for prejudgment attachment as to Prestige. The Plaintiffs are directed to submit a proposed order of attachment as to Prestige within 20 days of the date of this order.

■ However, even assuming the Plaintiffs could show a likelihood of success on the merits as to Artek and Sheynkman, the Court finds that attachment is not warranted because the Plaintiffs have not satisfied their burden under CPLR § 6201(3). Contrary to what has been provided for every other Management Company, including First Neptune who was also an alleged owner and manager of YMA (*Id.* at Ex. 7), in the Amended Complaint the Plaintiffs have not specifically alleged, nor have they provided any evidence that Sheynkman or Artek transferred any of the money they received from YMA to any of the money laundering entities. Accordingly, the Court denies the Plaintiffs' request for prejudgment attachment as to Sheynkman and Artek, without prejudice.

### III. CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED**, that the motion of Sheynkman and Artek to dismiss the Amended Complaint against them is denied in its entirety, and it is further

**ORDERED**, that the Plaintiffs' motion for the prejudgment attachment of the assets of Sheynkman and Artek, is denied without prejudice, and it is further

**ORDERED**, that the Plaintiffs' motion for the prejudgment attachment on the assets of Prestige Management is granted, and it is further

**ORDERED**, that the Plaintiffs' are directed to submit a proposed order of attachment with respect to Prestige Management within twenty days of the date of this order.

**SO ORDERED.**